Melvyn Epstein FESTINGER et al *v.*
Helen Epstein KANTOR et al

80-15, 80-174 and 80-184                    616 S.W. 2d 455

Supreme Court of Arkansas
Opinion delivered May 4, 1981
[Rehearing denied June 22, 1981.]

412

*Howell & Price*, by: *Dale Price*, for appellants Steve Festinger, Lynda Festinger White, Ed Festinger as Next Friend and Guardian Ad-Litem of Rebekkah Ruth White, Joan Elanine White and Paula White; and *Wright, Lindsey & Jennings*, by: *Alston Jennings, Sr.*, and *Eichenbaum, Scott, Miller, Crockett, Darr & Hawk, P.A.*, by: *Leonard L. Scott*, for appellant Melvyn Epstein Festinger.

*Robert R. Wright* and *Friday, Eldredge & Clark*, by: *Michael G. Thompson* and *James E. Harris*, for appellee Sylvia Epstein Angel; and *Sanford L. Beshear Jr.* and *Drew & Mazzanti*, by: *William H. Drew*, for appellees Sam Angel and Rodney Angel, Individually and Sam Angel, as Guardian of the Estates of Sam Epstein Angel II and Cheryl Angel, minors.

DONIS B. HAMILTON, Special Justice. This complex case involves three appeals pending in this court consolidated for argument and decision. The first case (80-15) consists of two cases which were consolidated in the trial court and has been previously before us. See *Festinger* v. *Kantor*, 264 Ark. 275, 571 S.W. 2d 82 (1978). As we commented then, it is not an overstatement to say the issues are as numerous as would ordinarily be found in a half dozen lawsuits. The basic issues in 80-15 involve the construction of the wills of Sam Epstein and Becke Ruth Epstein, his wife, the construction of the testamentary trusts found in each of those wills, accounting by the trustees, termination of the trusts, and partition of certain lands. The other two cases (80-174 and 80-184) involve appeals from the chancellor's orders concerning the sale of one of the assets (a cotton gin, its improvements and related acreage), and the confirmation thereof.

After having reviewed the orders appealed from, we affirm in part and reverse in part.

Prior to his death in 1944, Sam Epstein accumulated vast holdings in Chicot County consisting of approximately 10,000 acres of land, two properties and lots, rent houses, business properties, and a cotton gin. Surviving Sam Epstein were his widow, Becke Ruth Epstein, and three daughters, Helen Epstein Kantor, Sylvia Epstein Angel and Melvyn Epstein Festinger.

During his life, Sam Epstein either bought or arranged for the purchase of various properties aggregating approximately 1,000 acres consisting of various tracts, the deeds to which showed the grantees as being Becke Ruth Epstein (the wife of Sam Epstein), Helen Epstein, Sylvia Epstein, Melvyn Epstein, or in the name of Ben Angel (son-in-law of Sam Epstein and husband of Sylvia Epstein Angel), or in combination of two or more of these five persons. These properties constitute what will be referred to herein as the "disputed properties." Other properties which were unquestionably in Sam Epstein's name or which were acquired by the trustees of his testamentary trust are referred to as the "undisputed properties" or the "original lands." Certain other lands, although originally a portion of the disputed lands were later excepted out of the case by a stipulation of the parties and have been referred to as the "excepted lands."

Part VII of Sam Epstein's will, dated less than two months prior to his death, provides;

> I give, devise and bequeath to my said trustees, Ben Angel, Harold Kantor and Becky Ruth Epstein, . . . and unto the survivor of them, and their successor in trust as herein provided, all of my estate . . . to be held in trust as herein provided, all of my estate . . . to be held in trust by them for the use and benefit of my said beloved wife, Becke Ruth Epstein . . . and my said children, Helen Epstein Kantor, Sylvia Epstein Angel and Melvyn Epstein Festinger, share and share alike, and unto the heirs of their body and the survivor or survivors of them, per stirpes, for the uses, covenants, purposes and with and subject to the powers and limitations herein-

after expressed and declared of and concerning the same as follows ...

Subparagraph (F) of Part VII of the will provides that the net income of the trust estate should:

> be paid over ... to my beloved wife, Becke Ruth Epstein ... and to my children, Helen Epstein Kantor, Sylvia Epstein Angel and Melvyn Epstein Festinger, share and share alike, and unto the heirs of their body, and the survivor or survivors of them per stirpes, so long as they shall live, or until the expiration of this trust. ...

Subparagraph (G) of Part VII of the will is as follows:

> This trust shall remain in full force and effect for a period of ten years from the date of my death, and as long thereafter as my said wife shall live, provided she is a party beneficiary and trustee under this trust, if not, then for so long thereafter as the surviving beneficiary or beneficiaries hereunder may elect, and when, according to the terms hereof, this trust shall cease, it then is my will and I do so hereby devise, will and bequeath all of the remainder thereof, as well as money and all other assets of said trust estate, and the increase thereof, in fee simple and absolute, to the beneficiaries under this trust, share and share alike, and unto the heirs of their body, and the survivor or survivors of them, per stirpes.

It is undisputed that before his death, Sam Epstein controlled, managed, rented and collected the income from all of the properties, both disputed and undisputed. Although it is asserted that Sam Epstein kept some sketchy accounts in his books relating to income from properties variously owned among his wife, his daughters and his son-in-law, it is undisputed that only nominal amounts of income were actually distributed to the record title owners. After Sam Epstein's death, Ben Angel, who, by all accounts, was an honest, honorable and diligent manager, continued to manage all the properties, both disputed and undisputed, in the same manner as Sam Epstein had done prior to his death. For the period from 1944 to 1951, it is controverted as

to whether income from the disputed properties was accounted for in the books or ledgers that were kept. However, all distributions of income that were actually made were given in equal shares to the widow and three daughters. From 1951 until litigation was commenced, both disputed and undisputed properties were managed as a single unit without attempting to identify what income was produced by what property and with all distributions being made in five equal parts: one part was retained in the trust to provide for depreciation and capital expenditures; one part was distributed to Becke Ruth Epstein; and the remaining three parts were distributed to the three daughters.

Sam Epstein's widow, Becke Ruth Epstein, died testate in 1963. In one provision of her will, Mrs. Epstein implores her daughters to continue the Sam Epstein Testamentary Trust, apparently under the mistaken impression that it would continue after her death:

(3) It is my wish and desire that after my death, my daughters or those surviving me shall elect to continue the Sam Epstein Trust as their father intended for them to do. By so following the intent of their father, his grandchildren should always enjoy economic security as their grandfather provided for their mothers. If my daughters elect to continue said trust, it is my desire that my three daughters, the survivor or survivors, shall qualify and act as co-trustees with Ben Angel and such that all four of them will be charged with the duties and obligations imposed by the said Sam Epstein Trust. ...

In another portion of her will, and after making specific bequests, Mrs. Epstein leaves the residue of her property to her three daughters in trust to pay the income to the grandchildren during their lifetimes with the remainder over to the descendants of said grandchildren.

In 1964, the three Epstein daughters filed a petition in the Chancery Court of Chicot County alleging that they were the sole surviving heirs at law of Sam Epstein and the beneficiaries under his testamentary trust. The petitioners further alleged that the trust had been in existence and still

existed. They stated that they had elected to continue the trust after the death of their mother, Becke Ruth Epstein, and asked that the court approve their election to carry on the trust under the terms of the Sam Epstein will until the death of the last of the three daughters. A consent order of the Chancery Court of Chicot County was issued the next day authorizing the trust to:

> continue to operate as a trust estate under the provisions of said will and with Ben Angel, Helen Epstein Kantor and Sylvia Epstein Angel as trustees in succession, with all the powers, duties and under the terms of said trust estate ...

The three daughters of Sam Epstein, together with Ben Angel, continued to operate both the disputed and undisputed properties, apparently as trustees, although the management, direction and control of the properties were handled by Ben Angel whom all parties respected and trusted. It should be pointed out that so long as Sam Epstein lived, and after his death so long as Ben Angel lived and managed the affairs of the family, everyone was happy and all of the properties, both disputed and undisputed, were successfully managed as a unit. After Becke Ruth Epstein's death, rather than have the separate properties owned by her husband managed by the Becke Ruth Epstein Testamentary Trust, they were continued to be managed apparently as a part of the Sam Epstein Trust with the one-fifth share of the income which ordinarily would have gone to Becke Ruth Epstein being paid in equal shares to her grandchildren (Sam Angel and Rodney Angel, sons of Sylvia Epstein Angel, and Lynda Festinger White and Steve Festinger, the daughter and son of Melvyn Epstein Festinger — Helen Epstein Kantor not having any children).

In 1969, Ben Angel died. Without question, Ben Angel was the ridgepole over which the tent of the Epstein empire was draped. Without his character and leadership to give it form, the various Epstein holdings which were the canvas that sheltered and protected the Epstein family came down on their heads. The family members are now engaged in

what has been a seven-year struggle to see which member can walk off with the biggest part of the fabric.

The character of Ben Angel is evidenced by the following remarkable provision in his will:

> While the entire or an undivided interest in the naked or legal record of the separate parcels of real estate hereinafter identified in this Item Third of my will at my death may be in my name, such parcels of real estate are not owned by me personally and are not to be included in the assets of my estate. So, as soon as may be convenient after my death, my executrix shall execute a quitclaim deed conveying all of my right, title and interest, divided or undivided, appearing of record in such parcels of real estate to the trustees or to the beneficiaries for the title thereto to vest under the terms of the Last Will and Testament of the late Sam Epstein to be found of record in Will Record Book, Volume E, Pages 138 through 143, in the office of the Probate Clerk of Chicot County, Arkansas, identified and described, to wit: (here are described thirteen parcels of property referred to by the court below and the parties here as Tracts 1, 4, 14 and 76).
>
> If, for any reason, the Sam Epstein Trust Estate is not active or in existence at the time of my death or should be terminated or for any other reason this Item Three of my will cannot be carried into effect under the trust provisions of the will of Sam Epstein, deceased; then, in such event, my executrix shall execute a quitclaim deed conveying all of my right, title and interest in such parcels of real estate to the beneficiaries and as set out in the terms and provisions of the said Sam Epstein will.

Sylvia Epstein Angel, the widow of Ben Angel, was appointed executrix of his will with virtually unlimited power over the probate estate. Notwithstanding her position as trustee of the Sam Epstein Trust and notwithstanding her position as executrix of her husband's estate, she has refused to carry into effect the solemn provisions of her husband's will and has claimed that, as a surviving spouse and,

therefore, the surviving tenant by the entirety of the interest conveyed of record to her and to her husband (as well as to others) in the deeds to the four tracts, she claims the entire interest as her own.

Following the death of Ben Angel, the acrimony among members of the family grew until 1973 when the appellees, Helen Kantor and Sylvia Angel, filed suit in chancery court against the appellant, Melvyn Festinger, seeking partition of the lands in the Sam Epstein Trust, which they contended they owned in fee simple and stating that they were electing to terminate the trust as continued by the 1964 chancery court order. The properties sought to be partitioned, with minor exceptions, were the "undisputed" lands or "original lands" which Sam Epstein owned in his own name at his death. The appellant, Melvyn Festinger, filed a counter-claim and cross-complaint seeking, among other things, accounting, removal of the appellees as trustees, and the partition of the "disputed" lands. Over the seven years that the litigation has been pending there has been a multitude of pleadings and amended pleadings. Eventually, Rodney Angel and Sam Angel (children of Sylvia Epstein Angel); Sam Epstein Angel, II, and Cheryl Angel, through their guardian and father, Sam Angel; Steve Festinger and Lynda Festinger White (the children of Melvyn Epstein Festinger); and Rebekah Ruth White, Joan Elaine White and Paula White (children of Lynda Festinger White) have either intervened or have been joined as cross-defendants.

We do not deem it necessary to list all of the various claims made by each of the parties and their positions as to each claim. Suffice it to say, the abstract of pleadings, testimony and briefs submitted to this court include eleven volumes of printed material containing in excess of 2,350 pages, excluding appendices and photostatically reproduced exhibits. We shall attempt to deal with the issues as they relate to the chancellor's order below.

I.
INTERPRETATION OF THE SAM EPSTEIN WILL

The chancellor found that the Sam Epstein will,

portions of which are quoted above, vested a fee tail estate in one-fourth of the trust property in each of the three daughters and the widow, Becke Ruth Epstein. We agree. The unlettered opening portion of Part VII of the Sam Epstein will (which deals with the trust) conveys the property to the trustees:

> ... to be held in trust by them for the use and benefit of my said beloved wife, Becke Ruth Epstein ... and my said children, Helen Epstein Kantor, Sylvia Epstein Angel and Melvyn Epstein Festinger, share and share alike, and unto the heirs of their body and the survivor or survivors of them, per stirpes. ...

The dispository provisions of Subparagraph (G) of Part VII provides:

> ... and when, according to the terms hereof, this trust shall cease, then it is my will and I do so hereby devise, will and bequeath all of the remainder thereof, as well as money and all other assets of said trust estate, and the increase thereof, in fee simple and absolute, to the beneficiaries under this trust, share and share alike, and unto the heirs of their body, and the survivor or survivors of them, per stirpes.

When the provisions of Subparagraph (G) is read and closely related to the unlettered opening paragraph of Part VII, it is clear, we believe, that a one-fourth share in the trust property (real estate) vested, legally and equitably, in each daughter for life, with the remainder over to her bodily heirs, and the remaining one-fourth share vested, legally and equitably, in the mother, with the remainder to the three daughters equally, they being the bodily heirs of their mother.

It has been argued here that the *order* of the words used by Sam Epstein in the dispositive provisions of his will following the termination of the testamentary trust would result in the vesting of a fee simple to the widow and daughters in equal shares rather than a fee tail. In other words, by stating that the trust estate remaining would go

"in fee simple and absolute, to the beneficiaries under this trust, share and share alike, and unto the heirs of their body, and the survivor or survivors of them, per stirpes," the result is different than if the words "in fee simple and absolute" had, in that same sentence, followed the words "heirs of their body." Had the latter order of words been used, the devise would have been "to the beneficiaries and unto the heirs of their body in fee simple and absolute, share and share alike." The argument made is that since the language, "in fee simple and absolute" was used at the first portion of the sentence, the gift had been made in fee simple, and the remaining limitation over only to the heirs of the body is void. This argument is based on a line of cases traced from *Moody* v. *Walker*, 3 Ark. 147 (1840) down through *Bernstein* v. *Bramble*, 81 Ark. 480, 99 S.W. 682 (1907) and most recently announced in *Langston* v. *Hunt, Administrator*, 269 Ark. 328, 601 S.W. 2d 833 (1980). While we recognize the rule in the line of cases above mentioned, we have also, in applying the rule, stated that when the clear, unequivocal and demonstrated intent of the testator is to limit prior devise, the limitation will be given effect. In *Langston* v. *Hunt, Administrator*, supra, we stated:

> The present rule simply stated is that a testator cannot give an estate in fee simple by clear and concise language and subsequently diminish or destroy the devise by use of other language. In other words, once the fee is given to a person or class of persons or other devisee, it cannot thereafter be taken away or diminished *unless the terms are clear, unequivocal, and demonstrate the intent to limit the prior devise.* (Emphasis supplied.)

We believe that here, the testator's intent, expressed over and over almost to the point of repetitiousness, is clear and unequivocal that he wanted the estate to remain in the bloodlines of the mother and daughters. Therefore, we agree with the trial court that whether the words "in fee simple and absolute" came first or last in the particular sentence should carry no weight and should certainly not be allowed to thwart the many times expressed intention of the testator

that the trust properties were entailed to the named beneficiaries and the heirs of their body.

It has been argued here that the doctrine announced in *Bell* v. *Gentry*, 141 Ark. 484, 218 S.W. 194 (1920), would operate to vest title absolutely in the three daughters of Sam Epstein. This doctrine, which has also been followed in *Pletner* v. *Southern Lumber Co.*, 173 Ark. 277, 292 S.W. 370 (1927);*Eubanks* v.*McDonald*, 225 Ark. 470, 283 S.W. 2d 166 (1955); and *Creekmore* v. *Gregory*, 244 Ark. 1, 423 S.W. 2d 548 (1968), is that a conveyance to "A" for life, then to "B" and to the heirs of his body vests title in "B" in fee simple, absolute. We think that our construction of the will of Sam Epstein eliminates the application of the above doctrine. Each of the three daughters had the estate given her in one-fourth entailed upon her and her bodily heirs. There was no intervening life estate in another. As to the widow's interest, there was an immediate merger of the legal and beneficial or equitable title at her death which also happened to constitute the termination of the trust. No intervening life estate in a third party is indicated as to her interest. On the facts and our interpretation of the will here, the rule of *Bell* v. *Gentry* and its progeny would be inapplicable.

In accordance with the above, the real estate in the Sam Epstein Trust is owned as follows: each of the three daughters of Sam Epstein owns an undivided one-fourth interest in fee simple as a surviving heir of the body of Becke Ruth Epstein; each of the three daughters of Sam Epstein has an additional one-fourth interest for life, with the remainder over to her bodily heirs living at her death. The reversion of the estate tail of any daughter dying without bodily heirs will pass to the heirs at law of Sam Epstein in the same manner as if he had died intestate because no additional residuary clause other than that provided by the testamentary trust was contained in his will. See *Fletcher* v. *Hurdle*, 259 Ark. 649, 536 S.W. 2d 109 (1976); *Nowak* v. *Etchieson*, 241 Ark. 328, 408 S.W. 2d 476 (1966). We do not overlook Act 183 of 1979 but that statute clearly does not apply to the will of Sam Epstein who died some thirty-five years prior to its enactment.

Since a fee tail cannot exist in personalty, *Moody* v. *Walker*, 3 Ark. 147 (1840); *Slaughter* v. *Slaughter*, 23 Ark. 356 (1861), the personal property in the Sam Epstein Testamentary Trust vested one-fourth in each of the three daughters and one-fourth in Becke Ruth Epstein's estate (and from there to the Becke Ruth Epstein Testamentary Trust) at the death of Becke Ruth Epstein.

## II.
### EFFECT OF THE 1964 ORDER

Following the death of Becke Ruth Epstein, the three daughters filed a non-adversary petition in the Chancery Court of Chicot County alleging that they were the beneficiaries of the trust estate created under their father's will, that the administration of their father's estate had been concluded and requesting court approval for continued operation of the Sam Epstein Trust. The following day, the chancery court entered a consent order finding that the trust might properly be continued beyond the death of Mrs. Epstein and noting the election of the three daughters to continue the trust which the court granted pursuant to the terms of the will of Sam Epstein and the laws of the State of Arkansas. None of the prospective bodily heirs of the three daughters were parties to the proceeding and, apparently, most of them were minors at the time. Although the appellants argued vociferously to the trial court (as they have here) that the 1964 order was res judicata with respect to the ownership of the property and bound the three sisters to continue the trust until the death of the last survivor as among them, the trial court found to the contrary and we concur. As pointed out above, the order can certainly not bind the children of Sylvia Epstein Angel or Melvyn Epstein Festinger since they were not parties thereto. Further, the order simply authorizes the continuance of the trust *under the terms of Sam Epstein's will* which authorized a continuance of the trust at the election of the three sisters. Now, two of the three sisters, together with the children of one of them, who are apparent remaindermen, have elected and petition the court to discontinue the trust. The court below found that none of the three sisters was prevented from withdrawing her accord initially given to the continuance of the

family enterprises within the format of the father's testamentary trust. The court further found that any benefits arising by virtue of the continuance of the trust had given way and been lost due to family bitterness and cross purposes necessitating the termination of the trust. We believe, on the basis of the circumstances here existing and the wording contained in the Sam Epstein will and the 1964 order, the chancellor's decision on this point was correct.

## III.
### OWNERSHIP OF THE "DISPUTED LANDS"

While the bulk of the total family properties was undisputedly owned by Sam Epstein solely prior to his death, or was acquired by his estate and/or trust after his death, there were various lands estimated by us to exceed 3,200 acres and town lots the legal title to which was variously vested of record in the three daughters and their mother. It is virtually undisputed that the interests in the various tracts of land acquired by Sam Epstein during his life in his wife's and daughters' names resulted from transactions initiated and handled to conclusion by the father. Further, prior to his death, Sam Epstein or employees of his office were solely responsible for managing, farming, renting, paying taxes and collecting rents or income from these properties. After Sam Epstein's death, some sketchy records were kept in the Epstein office of receipts and expenses received and paid in connection with these disputed lands but apparently all actual distributions of income were made equally among the three daughters and their mother. From 1951 or 1952 all of the disputed lands were treated as part of the Sam Epstein Testamentary Trust for all purposes of managing, preserving, improving, leasing, collecting rents and profits therefrom, paying expenses in connection therewith and distributing the net rents and profits. Prior to the institution of this litigation, the net rents and profits, after the payment of expenses, were divided into five portions, one part of which was kept in the trust for replacement of depreciable items and capital investments, and four remaining parts were distributed equally to Mrs. Epstein and the three daughters. After Mrs. Epstein's death, her share was continued to be set apart to her

and it was distributed to her grandchildren, the beneficiaries of the Becke Ruth Epstein Testamentary Trust.

The appellants assert that the treatment of the disputed properties, both before and after Sam Epstein's death, indicates that, at the time of the acquisition of these properties, a resulting trust existed by which the legal title was vested variously among the mother and three daughters but equitable title remained in Sam Epstein and after his death became a part of his estate and testamentary trust.

At the outset, it should be pointed out that the appellants had a very heavy burden of proof. Under our cases, the party asserting the resulting trust must prove by clear, cogent and convincing evidence that such trust existed at the time of the transaction which vests title in the resulting trustee's name. *Standridge* v. *Standridge*, 253 Ark. 1004, 490 S.W. 2d 125 (1973); *Ripley* v. *Kelly*, 207 Ark. 1011, 183 S.W. 2d 793 (1944); *Harrison* v. *Cruse*, 233 Ark. 237, 343 S.W. 2d 789 (1961); and *Bebout* v. *Bebout*, 241 Ark. 291, 408 S.W. 2d 480 (1966). Further, since the parties involved were the wife and daughters of Sam Epstein and therefore, the natural objects of his affection and largess, the law presumes that his purchase of property and registration of legal title thereto in the family members' names were intended as gifts by him to them. *Milner* v. *Freeman*, 40 Ark. 62 (1882); *James* v. *James*, 41 Ark. 301 (1883); *White* v. *White*, 52 Ark. 188, 12 S.W. 201 (1889); *Harbour* v. *Harbour*, 103 Ark. 273, 146 S.W. 867 (1912); *Roller* v. *Roller*, 214 Ark. 382, 216 S.W. 2d 399 (1949); and *Harrison* v. *Knott*, 219 Ark. 565, 243 S.W. 2d 642 (1951).

While at first blush the proof that Sam Epstein, during his lifetime, exercised dominion, management and control of the disputed properties, and after his death Ben Angel, who managed the Sam Epstein Testamentary Trust, did so likewise, would seem to indicate that a resulting trust existed, the chancellor was not convinced that this rose to the standard of proof required of the appellants. Indeed, the explanation of the appellees that the properties were managed and operated as an integrated unit for economic efficiency and convenience to the parties seems plausible. This is especially so when it is remembered that in addition to the

farmlands involved, the undisputed properties included a cotton gin, feed, seed and chemical warehouse and business properties, all of which required a large land base which the combined farming properties provided. Further, some of the family members were able to produce receipts for payments on land issued in their names and other documents where mortgage lienholders had been paid and the satisfied documents were returned to the record title owners and not to Sam Epstein. When Mrs. Epstein died, the probate proceeding of her estate and the estate tax return thereon showed that the family members reported the property title in Mrs. Epstein's name as having been owned by her at the time of her death.

The trial court heard all of the evidence and was in a position to evaluate the demeanor of the witnesses and followed the developments of the case much better than we can from the cold record and abstract thereof. With the exception of the specific tracts discussed hereinafter, we cannot say that the chancellor's finding was clearly erroneous and, therefore, with the exception hereinafter described, we affirm. Rule 52 of the Arkansas Rules of Civil Procedure; *Ford Motor Co.* v. *Yarbrough*, 266 Ark. 457, 587 S.W. 2d 68; *Titan Oil & Gas* v. *Shipley*, 257 Ark. 278, 517 S.W. 2d 210 (1974).

There were four tracts purchased by Sam Epstein during his lifetime, the legal title to which he caused to be registered in the name of his son-in-law, Ben Angel, in addition to his wife and/or daughters. Tracts 1 and 14, containing 235 acres and 501 acres, respectively, were conveyed of record in 1941 to Ben Angel, Sylvia Angel, Melvyn Epstein, Helen Epstein and Ruth Epstein. Tract 4, containing 181.63 acres, was conveyed in 1941 to Ben Angel, Sylvia Angel and Helen Epstein. Tract 76, containing 32 platted lots with lakeside frontage, was conveyed in 1938 to Ben Angel and Sylvia Epstein Angel. The position of Ben Angel is best described by the following quotation from the excellent memorandum opinion of the chancellor:

> ... Ben Angel had the utmost respect and trust of Sam Epstein, Mrs. Epstein, and each of his two sisters-in-law as well as their respective husbands, and ... this

respect and trust have survived him. The record in this case establishes that he was a person of sound business judgment and acumen and of unquestioned integrity, was deserving of the great trust that his family placed in him and was equal to the responsibilities of his position, which might be said was that of patriarch in this family following Sam Epstein's death. The provision to be discussed immediately below incorporated into his will perhaps characterizes this man's qualities just referred to.

The first sentence of the provision in Ben Angel's will described by the chancellor states:

> While the entire or undivided interest in the naked legal or record title of the separate parcels of real estate hereinafter identified in this Item Third of my will at my death may be in my name, such parcels of real estate are not owned by me personally and are not to be included in the assets of my estate.

The chancellor found that this provision of Ben Angel's will was clear, cogent and convincing proof as to Ben Angel's interest only that he was a resulting trustee; declared Ben Angel's interest reflected in each of the deeds to be that of an undivided interest in common with the other record title owners and vested that interest in Sam Epstein and his testamentary trust. We agree with the chancellor's reasoning that the provision of Ben Angel's will, when taken together with the other evidence, does meet the standard of clear and convincing proof of a resulting trust as to the lands described in his will. We would not limit the trust to Ben Angel's interest only however.

Since each of the deeds to the four tracts treated Ben Angel in the same manner as the other grantees and since all four of these tracts were handled in precisely the same manner as those tracts referred to as "undisputed properties" we believe that Ben Angel was not the only resulting trustee of these tracts but also all of the record title owners were resulting trustees of these four tracts for the use and benefit of Sam Epstein and after his death for his estate and testa-

mentary trust. Therefore, as to Tracts 1, 2, 14 and 76 we hold that legal title should be divested from the record title owners thereof or their successors and vested in the trustees of the Sam Epstein Testamentary Trust to be distributed in accordance with the terms of Sam Epstein's will as construed hereinabove. With these exceptions, the decision of the chancellor relating to the "disputed lands" is affirmed.

## IV.
### *REIMBURSEMENT OF CAPITAL CONTRIBUTIONS*

During the trial, it was shown that certain amounts were treated as capital contributions of the three Epstein daughters toward the operation of the Sam Epstein Testamentary Trust. The chancellor ordered that these capital contributions be returned to the three daughters. This seems an altogether reasonable approach in settling the various accounts of the trust and it is our duty to affirm the chancellor's action unless we find it clearly erroneous which we do not. Rule 52 of the Arkansas Rules of Civil Procedure.

## V.
### *REMOVAL OF TRUSTEES*

The appellants assert that the chancellor erred in refusing to remove Helen Epstein Kantor and Sylvia Epstein Angel as trustees of the Sam Epstein Testamentary Trust. Since the death of Ben Angel, it does appear that, when viewed through the eyes of the appellants, the trustees have managed the trust in such a manner so that it results in benefits to the trustees and their families. Further, it is obvious that there is a great deal of hostility between the Festinger family on the one hand and the Angel family and Mrs. Kantor on the other.

However, the removal of a trustee lies in the sound discretion of the trial court and we cannot say that the chancellor abused his discretion. *Blumensteil* v. *Morris, Executor,* 207 Ark. 244, 180 S.W. 2d 107 (1944). The matter should, however, be reviewed by the chancellor on remand in the light of the present situation which may well warrant a neutral trustee.

## VI.
### *MISCELLANEOUS ADDITIONAL ISSUES*

There were various other miscellaneous issues raised by the appellants or the appellees on appeal or cross-appeal. Among them are the appellants' assertion that the trial court erred in dismissing the Becke Ruth Epstein Trust properties from the suit; the appellees' objection to the court's holding that the lands acquired by the Sam Epstein Testamentary Trust during its existence were also entailed in the same manner as lands owned by Sam Epstein prior to his death; the appellees' objection to the chancellor's allocation of income to the various parties while the lawsuit was pending; and Sam Angel's objection to the action of the trial court in reducing his salary during the pendency of the lawsuit to the levels that existed prior to the institution of suit. We cannot find that the chancellor's actions on these points are clearly erroneous and, therefore, affirm the same. Rule 52 of the Arkansas Rules of Civil Procedure.

In cases 80-174 and 80-184, the appellants objected to the actions of the chancellor in selling the cotton gin, the related acreage and improvements thereto and confirming the same while the substantive issues regarding the interpretation of the will and the order of partition were pending in this court under Cause 80-15. Additionally, appellants objected to the minimum sales price (or "upset price") set by the chancellor as being the minimum amount the trustees were authorized to accept at the sale. In the first place, no order of supersedeas or supersedeas bond has been abstracted by the appellants and we could find no such order or bond in the record. Under Rule 8(a) of the Arkansas Rules of Appellate Procedure, a supersedeas order and bond are necessary to stay any proceedings on the decree or order being appealed from. Additionally, upon a review of the abstract of the pleadings and testimony, we are unable to find that the chancellor's actions are clearly erroneous. Rule 52 of the Arkansas Rules of Civil Procedure.

Finally, after all briefs had been submitted, but prior to oral argument in this case, the appellants and appellees filed motions to dismiss the appeals and the cross-appeals in

Cause 80-15 on the basis of actions taken by the respective parties relating to the sale of the cotton gin and other properties. The points raised by these motions have been rendered moot by the decisions above and are, therefore, denied.

The decision in Cause 80-15 is affirmed in part, reversed in part and remanded to the trial court for proceedings not inconsistent herewith. The decisions of the chancellor in Causes 80-174 and 80-184 are affirmed at the cost of appellants.

ADKISSON, C.J., and HOLT, J., not participating.

Special Justice MICHAEL CASTLEMAN joins in the opinion.

PURTLE and HAYS, JJ., dissent in part.

STEELE HAYS, Justice, dissenting. I respectfully dissent on the grounds that the Order of Chicot County Chancery Court entered September 1, 1964, is now *res judicata* to the issues there presented and the parties to that order are now barred from raising such issues in this appeal.

The Order of September 1, 1964, specifically provides:

That Helen Epstein Kantor, Sylvia Epstein Angel and Melvyn Epstein Festinger have elected and do elect to continue said Trust until the death of the last one of said beneficiaries under said Will and as the sole surviving heirs at law of Sam Epstein, deceased.

We have long held that consent decrees and consent judgments are *res judicata* as if entered as a judgment after trial on the merits and, as such, are not subject to collateral attack. *Lewis* v. *St. Louis, I.M. & S. Ry. Co.*, 107 Ark. 41, 154 S.W. 198 (1913).

In *Wooldridge* v. *Hotze*, 215 Ark. 8, 219 S.W. 2d 216 (1949), the deceased died testate in 1909 creating a trust in favor of his three children with the corpus of the trust to be distributed to his grandchildren upon the death of the last

surviving child. Provisions were also made whereby the trustee was to create a fund from the estate's assets for improvements to real property remaining in the corpus of the trust. A dispute arose in 1937 as to how the improvements fund was to be created and administered. The court in that dispute in effect rendered void the provision in the will creating the fund due to apparent impossibility of performance. In 1948, a dispute again arose as to the improvements fund. The trial court held: "The parties all assented to the order entered in 1937 ... all the respective parties to this controversy are bound by said order." *Wooldridge*, at 11. On appeal, the Supreme Court affirmed:

> We hold that the trial court correctly held that the issues now presented are *res judicata* by reason of the 1937 decree, *supra*. Appellants were bound by the decree. It is undisputed that at the time that decision was rendered appellants were parties, consented to that decree, and have acquiesced in the court's construction of the will for more than 10 years thereafter. *Wooldridge*, at 12.

In this case the same result is equitable and appropriate. Coincidentally, it is precisely what Sam Epstein wanted his children to do, which no doubt influenced them toward that end.

It is undisputed that Helen Epstein Kantor, Sylvia Epstein Angel and Melvyn Epstein Festinger were parties to the 1964 proceeding. It is equally clear that each enjoyed the benefits of the 1964 order, as beneficiaries of the trust created by Sam Epstein, for a great many years. It is evident that they mutually elected "to continue said Trust until the death of the last one of said beneficiaries ..." and gave that election the formality and sanction of a decree of the chancery court. It is now much too late to hear those parties complain that some other interpretation of Sam Epstein's will or of the 1964 order should be adopted.

Justice PURTLE joins in this dissent.