UNITED STATES of America, Plaintiff

v.

Jack JEPSEN, Kris Jepsen, Karen Jepsen Makutenas, First Federal Savings & Loan of Harrison, Arkansas Department of Finance & Administration, and Baxter County Assessor, Defendants.

No. CIV. 98–3066.

United States District Court,
W.D. Arkansas,
Harrison Division.

May 17, 2000.

Andrew T. Pribe, U.S. Dept. of Justice, Tax Division, Washington, DC, P. K. Holmes, III, U.S. Attorney's Office, Fort Smith, AR, for Plaintiff.

David Grant Bercaw, Ball & Mourton, Ltd., Fayetteville, AR, Mark S. Ferguson, Little Rock, AR, for Defendants.

### *MEMORANDUM OPINION*

H. FRANKLIN WATERS, District Judge.

This case is before the court on the plaintiff's motion for partial summary judgment on count one of the complaint and the motion for summary judgment on counts one and two of the complaint filed by defendants, Jack Jepsen, Kris Jepsen, and Karen Jepsen Makutenas. In count one, the United States seeks to foreclose a federal tax lien. In count two, the United States seeks to set aside as a fraudulent conveyance a release of a mortgage on property located in Arkansas.

The court previously granted the United States' motion for partial summary judgment on count three. Count three concerned the United States' assessment pursuant to 26 U.S.C. § 6672 of a 100%

penalty in the amount of $214,263.08 against Jack Jepsen. In granting the government's motion for partial summary judgment on count three, we found as a matter of law that Jack Jepsen was a responsible person who willfully failed to pay federal withholding taxes. The withholding taxes at issue cover the four quarters of 1992 and the first quarter of 1993.

The opinion issued in connection with the United States' first motion for·summary judgment set forth the facts concerning the operation of Jepsen of Illinois; Inc., and Jack Jepsen's role in the same. Familiarity with that opinion is assumed.

### Background

On August 15, 1989, Jack Jepsen executed a warranty deed conveying Lot 2 of Mallard Point Home Sites, in Baxter County, Arkansas, to his son and daughter, Kris Jepsen and Karen Jepsen Makutenas.[1] The property consists of a two acre parcel of land with a 1200 to 1400 square foot house on it. Jack and his family had used the house as a vacation home.

Kris and Karen executed a promissory note dated August 15, 1989, in the amount of $95,000 in favor of Jack. The note bore interest at the rate of 9½% with the interest payable on each anniversary date and the entire principal due and payable on August 15, 1992. Currently only a photostatic copy of the promissory note is known to exist.

The note was secured by a real estate mortgage on the property. The mortgage was also dated August 15, 1989.

The documents indicate they were prepared by George Carberry. Carberry is a corporate attorney who did work for Jepsen of Illinois, Inc. *Deposition of Jack Jepsen* at 12. Jack believed Bob Bailie, the chief financial officer of Jepsen of Illinois, probably handled the paper work. *Id.* at 25. This belief was based on the fact that Bailie frequently handled personal business for Jack because he traveled frequently. *Id.*

Kris gave Jack a check dated August 15, 1989, in the amount of $10,000 with the notation "deposit Arkansas" on it. Similarly, Karen gave Jack a check for $10,000 as a down payment on the property.

On October 12, 1989, the deed and mortgage were recorded with the Baxter County Recorder of Deeds. On December 26, 1989, Jack by letter returned Kris' $10,000. Jack stated he had decided to give Kris the "down payment required on the purchase of the Arkansas property." Jack also returned Karen's check indicating he was giving her the down payment required on the purchase of the Arkansas property.

After he transferred the property to his son and daughter, Jack continued to use the property. *Deposition of Jack Jepsen* at 31. Sometimes he would call ahead of time and other times he would just show up. *Id.* He testified he used the property only if his use did not interfere with Kris' plans.

On April 25, 1994, the Internal Revenue Service (IRS) made an assessment against Jack in the amount of $214,263.08. The assessment concerned the failure of Jepsen of Illinois, Inc., to pay the trust fund portion of federal withholding taxes for the four quarters of 1992 and the first quarter of 1993.

On March 21, 1995, Jack executed a release of mortgage regarding the Arkansas property. On April 17, 1995, Karen executed a quitclaim deed conveying all her interest in the Arkansas property to Kris. On April 25, 1995, the release of mortgage and the quitclaim deed were recorded with the Baxter County Recorder of Deeds.

Jack never received any payments on the note, or for the property, from his children. Jack received no consideration for his release of the mortgage.

---

1. For the sake of brevity, we will refer to Jack Jepsen, Kris Jepsen, and Karen Jepsen Makutenas by their first names.

During his deposition, Jack testified that he gave the property to Kris and Karen. *Deposition of Jack Jepsen* at 17. He indicated he began thinking of conveying the property to them at the time of his divorce in 1983. *Id.* at 16–17.

When questioned about the note and mortgage, Jack testified he could not recall seeing the documents before this lawsuit. *Deposition of Jack Jepsen* at 17. The only explanation he could offer to explain the existence of the note and mortgage was that he must have been going to sell it to his son and daughter but that the only plan ever carried out was his "gifting it to them in 1989." *Id.* at 19. *See also* page 22 ("There was no sale. There was never a sale."). Jack testified he did not have any documents reflecting that he had made a gift of the property to his son and daughter. *Id.*

Jack also testified he had no recollection of receiving the promissory note but believed that if he did receive one "it would have been torn up when I gifted them the property." *Deposition of Jack Jepsen* at 19. In fact, he testified everything having to do with the sale should have been torn up because his intention, from the point he returned the checks on, was to convey the property through gifting. *Id.* at 42.

In responding to discovery, specifically interrogatory 11, Jack indicated he gave his children the property on August 15, 1989. However, in the response to interrogatory 26, he indicated the property was given to Kris and Karen on December 26, 1989.

In his deposition testimony, Jack indicated that prior to getting the checks from Kris and Karen he had been thinking about selling them the Arkansas place but changed his mind when he gave the checks· back. *Id.* at 24. With respect to the release, Jack testified that the release was prepared and signed after Kris found out there was a mortgage on the property when he was attempting to borrow money on it. *Deposition of Jack Jepsen* at 32.

Kris testified he had no recollection of executing either the note or the mortgage although he indicated the signatures thereon were his. *Deposition of Kris Jepsen* at 14–15. With respect to his $10,000 check, Kris testified it was to purchase the property but that it was returned to him because his father wanted to give the property to them. *Id.* at 19–20. With respect to the release, Kris testified he was attempting to get a loan and he needed a release of the "mortgage that never happened, so that [he] could own the property clearly." *Deposition of Kris Jepsen* at 34.

### Summary Judgment Standard

The question before the court is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See e.g., Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Johnson v. Baptist Medical Center,* 97 F.3d 1070, 1072 (8th Cir.1996). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990).

### Discussion

As we noted above, both sides seek summary judgment on count one. Defendants also seek summary judgment on count two.

### 1. Count One—Action to Foreclose the Federal Tax Lien

■ On April 25, 1994, the IRS made an assessment against Jack of the trust fund recovery penalty in the amount of $214,263.08. A lien in favor of the United States arises with respect to all property and rights to property of a taxpayer on the date of the assessment if that assessment is not paid. *See* 26 U.S.C. §§ 6321, 6322. "When Congress so broadly uses the term 'property' ... the Legislature aims to reach 'every species of right or interest protected by law and having an exchangea-

ble value.'" *Drye v. United States*, 528 U.S. 49, 120 S.Ct. 474, 480, 145 L.Ed.2d 466 (1999) (internal quotations and citations omitted). *See also United States v. McDermott*, 507 U.S. 447, 448, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993); *United States v. National Bank of Commerce*, 472 U.S. 713, 719–20, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985) ("Congress meant to reach every interest in property that a taxpayer might have."); *Thomson v. United States*, 66 F.3d 160 (8th Cir.1995).

The lien continues until the liability is satisfied or becomes unenforceable by lapse of time. 26 U.S.C. § 6322. Collection of the tax may occur through levy or by bringing an action in court. A collection action must be brought within ten years from assessment. 26 U.S.C. § 6502(a).

By virtue of its April of 1994 assessment, the government obtained a tax lien against all of Jack's property, including any interest he had in the note and mortgage on the Mallard Point property. As a matter of law, Jack claims he had no property interest in the Mallard Point property to which the federal tax lien could attach.

**(a). "Property Interests"**

■ State law governs the initial inquiry into "what rights the taxpayer has in the property the Government seeks to reach." *Drye v. United States*, 528 U.S. 49, 120 S.Ct. 474, 481, 145 L.Ed.2d 466 (1999) Then we look to "federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Id. See also United States v. Rodgers*, 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *United States v. Green*, 201 F.3d 251, 253 (3d Cir.2000); *United States v. Stonehill*, 83 F.3d 1156, 1159 (9th Cir. 1996) ("To determine whether the property is subject to the federal tax lien, the court conducts a two-part analysis. First, state law determines the nature of the legal interest the taxpayer has in the property. Once the court determine the state-law right possessed by the taxpayer, then

the federal tax consequences are solely a matter of federal law.").

■ The government acquires by its lien "no greater right to property than the taxpayer himself has at the time the tax lien arises." *St. Louis Union Trust Co. v. United States*, 617 F.2d 1293, 1301 (8th Cir.1980). *See also Gardner v. United States*, 34 F.3d 985 (10th Cir.1994) ("the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out," *quoting* 4 Boris Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 111.5.4 (1981)).

**(b). Gift or Sale of the Property**

■ Jack first argues the August 15, 1989, conveyance of the Mallard Point property to Kris and Karen was a valid inter vivos gift. The government responds by pointing out that the available records, including the deed and mortgage that were recorded in the land records of Baxter County, demonstrate that Jack sold the property to Kris and Karen and retained a mortgage. The government therefore argues its lien attached to Jack's interest in the note and mortgage.

The United States asks this court to find that the lien attached to the mortgage and right of payment thereunder, that the release of the same was ineffective, and direct foreclosure of the lien. If its motion is granted with respect to count one, the United States indicates count two is rendered moot.

As mentioned above, we look to state law to determine the character of the interest Jack had in the note and mortgage on the Mallard Point property in April of 1994, "but federal law determines whether or not, and at what point in time, a tax lien may attach to that property interest." *In re Orr*, 180 F.3d 656, 660 (5th Cir.1999) (citation omitted), *cert. denied*, 529 U.S. 1099, 120 S.Ct. 1835, 146 L.Ed.2d 778 (2000). *See also Miller v. Alamo*, 975 F.2d 547, 552–53 (8th Cir.1992).

Here, the tax lien did not "arise" until long after Jack had transferred the property either by gift or sale to his son and

daughter. Obviously if the transfer was by valid gift, Jack had no legal or equitable interest in the Mallard Point property in 1994 to which the lien could attach.

Jack testified he intended to give the property to his children in 1989 and believed he had done so. In his view, his donative intent is evidenced by: (1) the fact that he returned the down payment to his son and daughter in December of 1989; and (2) the fact that no demand for payment was ever made or contemplated. Jack also argues the making of the gift is evidenced by the following facts: (1) both he and Kris testified they did not know a mortgage instrument had been filed until Kris attempted to obtain a loan on the property; (2) Kris received all income from the property after 1989; (3) Kris paid all expenses of the property from 1989 on; and (4) Jack asked Kris' permission to use the property after 1989.

The Arkansas Supreme Court has stated that:

> a valid inter vivos gift is effective when the following requirements are proven by clear and convincing evidence: (1) the donor was of sound mind; (2) an actual delivery of the property took place; (3) the donor clearly intended to make an immediate, present, and final gift; (4) the donor unconditionally released all future dominion and control over the property; and (5) the donee accepted the gift.

*O'Fallon v. O'Fallon*, 341 Ark. 138, 139, 14 S.W.3d 506 (2000).[2] "The rule in Arkansas

is that the law presumes a gift when the donor registers legal title in a family member's name." *Perrin v. Perrin*, 9 Ark.App. 170, 175–76, 656 S.W.2d 245 (1983) (*citing Festinger v. Kantor*, 272 Ark. 411, 616 S.W.2d 455 (1981); *Harrison v. Knott*, 219 Ark. 565, 243 S.W.2d 642 (1951)).

Facts suggesting that a gift of the land was intended include: (1) the close relationship between the donor and the donees; (2) the testimony of both Jack and Kris; (3) the return of the down payment checks; and (4) the fact that no payments of principal or interest were ever made and no demand for payment was ever made.

Certain facts merely tend to establish a transfer of ownership. For instance, the following facts are indicative of neither a sale or a gift but instead are merely indicative of transfer of the rights of ownership: (1) that Kris has received all income from the property; (2) that Kris has paid the expenses of the property since 1989; and (3) that since 1989 Jack has, at least part of the time, asked Kris' permission before he used the property.

Facts undercutting any finding that a gift was intended include: (1) the execution of the note and mortgage and the recordation of the mortgage; and (2) Jack's acceptance of the down payment checks, his retention of the same from August until December, and the wording of his letter returning the checks.[3] With respect to his return of the checks, both letters are identical and state: "I have

---

**2.** Although both parties appear to agree that Arkansas law applies to the issue of whether or not a valid inter vivos gift was made, we note that the laws of both Arkansas and Illinois are substantially the same in this regard. Under Illinois law, the party claiming a gift occurred must show donative intent, delivery, and acceptance. *Estate of Poliquin*, 247 Ill. App.3d 112, 186 Ill.Dec. 801, 617 N.E.2d 40 (1993). "Donative intent is intention on the part of the donor that there be a present and irrevocable transfer of the subject gift; delivery of the gift is the means whereby the intent is given effect. The burden of proving facts to show a gift is on the donee, and the proof must be by clear and convincing evidence."

*Id.,* 247 Ill.App.3d 112, 186 Ill.Dec. 801, 617 N.E.2d at 43 (citations omitted). The rule in Illinois is that the transfer of personal property into a joint tenancy by a parent to a child with the right of survivorship creates a presumption of a valid gift to the child as surviving tenant. *Estate of Martin v. Connell*, 201 Ill.App.3d 1061, 147 Ill.Dec. 772, 559 N.E.2d 1112 (1990).

**3.** Defendants refer to Jack's act in December of 1989 of returning the checks to Kris and Karen as the completion of the gift of the Mallard Point property and the forgiveness of the debt.

decided to give you the down payment required on the purchase of the Arkansas property. Accordingly, I am returning your check in the amount of $10,000." Significantly, Jack's letter limits the gift to the down payment and refers to the property transfer as a purchase.

While defendants argue Jacks' act of immediately executing a release upon being told by Kris that a mortgage had been recorded supports their argument that a gift occurred, we believe this fact to be suspect at best. The release was executed years after the alleged gift occurred and after the federal tax assessment. We are unable to conclude as a matter of law that Jack intended the property transfer to be a gift. A genuine issue of material fact exists that precludes summary judgment in favor of either party on this issue.

### (c). Sale of the Property, Release of the Mortgage and Expiration of the Security Interest

■ Even if the court concludes a valid gift did not occur and treats the transaction as a sale, Jack still contends the government does not have a lien against the property or the note and mortgage. Whether viewed as a sale or not, defendants argue the property was conveyed in 1989 and the lien could only attach to the mortgage. As the mortgage was released, defendants contend all actions on it are barred. Ark.Code Ann. §§ 18–40–104 and 18–40–107.

With respect to the release, Jack argues there was no failure of consideration for the release since he was previously unaware of the fact that a mortgage had been filed against the property. Thus, he states his action is consistent with his having given the property to his son and daughter and necessary to remove the cloud on the title created by the existence of the mortgage.

We have already found the proof insufficient to establish as a matter of law that the transfer of the property in 1989 consti-

tuted a valid inter vivos gift. We now reject Jack's arguments that the lien of the United States was removed when he executed the release. The government's lien attached to Jack's "property interests" in April of 1994. The lien could not be defeated, displaced, or diminished by the transfer of an interest in the note and mortgage or Jack's purported release of the same. *See e.g., United States v. Goldberg,* 362 F.2d 575, 577 (3d Cir.1966) ("[S]ubsequent transfer or an interest in a note and mortgage did not displace or diminish the tax lien."). Jack could not defeat the lien of the United States by executing a release of the mortgage.

Jack nevertheless contends any lien that arose in April of 1994 is unenforceable because any "interest" he had in the property expired or ceased to exist. In this regard, he points out the note was by its terms in default on August 15, 1990, and that it was due and payable in full in 1992. As actions to enforce written obligations must be commenced within five years after the cause of action accrues, Ark.Code Ann. § 16–56–111, Jack argues any right he would have had to enforce the note or foreclose the mortgage would have expired in August of 1997. Since the note and mortgage was unenforceable as far as he was concerned, he contends the government's tax lien also became unenforceable.

First, the United States contends defendants waived any statute of limitations defense by failing to assert the defense in their answer. With respect to count one, we find this argument unpersuasive. The United States misconstrues defendants' position. Defendants do not argue that the statute of limitations bars the government's cause of action; rather, defendants argue that under Arkansas law Jack's "interest" was finite and ceased to exist.

Second, the United States contends Jack's analysis is flawed because it relies on an application of Arkansas law. It contends the Arkansas Uniform Conflict of Laws Limitation Act[4] dictates the applica-

---

4. This Act was repealed by Acts 1999, No. 310, § 1. However, it was in existence when

tion of Illinois law [5] to the promissory note. Illinois law provides for a ten year limitations period for actions on written contracts. Thus, the government contends the note is enforceable.

"Generally, in federal courts the limitations provisions of the forum state apply where the issue is not governed by federal statute." *Kansas Public Employees Retirement v. Reimer & Koger*, 61 F.3d 608, 611 (8th Cir.1995). Thus even "[i]n a federal question case, where there is no federal statute of limitations, the federal court will borrow the forum state's limitations laws, if not inconsistent with federal law or policy." *Id.*

At the relevant time, § 16–56–201 provided as follows:

(a) Except as provided by § 16–56–204, if a claim is substantially based:

(1) Upon the law of (1) other state, the limitation period of that state shall apply; or

(2) Upon the law of more than (1) state, the limitation period of one (1) of those states, chosen by the law of conflict of laws of this state, shall apply.

(b) The limitation period of this state shall apply to all other claims.

While Arkansas courts apply the law of Arkansas to transactions involving lands within its boundaries, *see Bank of Oak Grove v. Wilmot State Bank*, 279 Ark. 107, 648 S.W.2d 802 (1983), the situs of the land does not control when the issue concerns the validity of the debt underlying a mortgage interest. In such cases, the Arkansas courts have pointed out that the debt usually arises out of a contract and its validity should be governed by whatever law governs the transaction as a contract.

For instance, in *Cooper v. Cherokee Village Development Co.*, 236 Ark. 37, 364 S.W.2d 158 (1963), the Arkansas Supreme Court held that the situs of the land secur-

ing a debt does not control the choice of law. It stated:

However, we think the facts in the instant case are more closely analogous to the cases in which the borrower has executed a promissory note in another state, payable in such other state, to be secured by a mortgage on Arkansas land. In these note and mortgage cases, this court is committed to the rule that the governing law is to be determined under the ordinary choice of law rules for contracts, just as if there were no mortgage.

*Id.*, 236 Ark. at 42, 364 S.W.2d 158.

■ In this case, the note indicates it was executed in Illinois. The mortgage executed the same day was notarized in Illinois. Jack and Kris both appear to have been residents of Illinois at that time. We therefore believe the government is correct and Illinois law applies.

In 1989, Illinois had a ten-year statute of limitations for written obligations. Ill.Rev. Stat. Ch. 110 ¶ 13–206 (1989). In 1992, a six-year limitation period was adopted. In 1998, Illinois once again adopted a ten-year statute of limitations for promissory notes. 735 Ill. Comp. Stat. 5/13–206; 810 Ill. Comp. Stat. 5/3–118 (2000).

The government agrees that Arkansas law controls the mortgage interest in the property. However, as Ark.Code Ann. § 18–49–101(a) limits the period to enforce the mortgage to the limitations period for the underlying note, the government states application of § 18–49–101(a) is also dependent on Illinois law.

■ It is important to remember that the Internal Revenue Code "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *United States v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 2

---

the United States filed the complaint in 1998.

**5.** The government concedes that its rights are equivalent to Jack's while seeking to foreclose its lien interest. It makes no argument that

the ten year statute of limitations for collection of a tax liability contained in 26 U.S.C. § 6502(a) is the limitations period applicable to actions to enforce the note.

L.Ed.2d 1135 (1958). Once a tax liability has attached the taxpayer cannot avoid or defeat liability by disclaiming or renouncing interest in the property or transferring or conveying the interest. *Drye*, 120 S.Ct. at 482–83 (tax lien could not be defeated by disclaiming interest in an estate); *Rodgers*, 103 S.Ct. at 2141 n. 16.

■ However, a tax lien "cannot extend beyond the property interests held by the delinquent taxpayer." *Rodgers*, 103 S.Ct. at 2141. A federal tax lien "may be extinguished if the property itself is extinguished." *Rodriguez v. Escambron Development Corp.*, 740 F.2d 92, 99 (1st Cir. 1984). For instance, a " 'state judgment terminating the taxpayer's rights to an asset also extinguishes the federal lien attached thereto.' " *Id.* (*quoting* 4 B. Bittker, *Federal Taxation of Income, Estate and Gifts* ¶ 111.5.4, at 111–102).

■ Similarly, when the taxpayer's interest subject to the lien is a terminable interest, such as an option contract, a lease, or a forfeitable interest under an installment sales contract, the government's lien on that particular property is extinguished at the same time as the taxpayer's interest. *Id.* (citations omitted). "In these cases, the attached property right ceased to exist; accordingly, there was nothing left against which the government could assert its interest." *Id.*

■ In April of 1994, when the lien attached Jack's interest was his right to file a cause of action to collect on the note or to foreclose on the property. *United States v. Goldberg*, 362 F.2d ʻ575, 577 (3d Cir.1966) ("The federal tax lien attached to the note and mortgage when the taxes were assessed.") In other words, he had a personal property right in a chose in action.

■ Illinois attaches property rights to choses in action. *Kaiser–Ducett Corp. v. Chicago–Joliet Livestock Marketing Center, Inc.*, 86 Ill.App.3d 216, 41 Ill. Dec. 651, 407 N.E.2d 1149 (1980) (Choses in action are intangible personal property). It has been held that so long as the state law interest is " 'an economic asset in the sense that it has pecuniary worth and is transferable,' then it is subject to the federal tax lien." *United States v. Stonehill*, 83 F.3d 1156, 1159 (9th Cir.1996). *See also United States v. Goldberg*, 362 F.2d 575, 577 (3d Cir.1966) ("As a chose in action the note and mortgage was intangible personal property."). Thus, Jack's "property interests" were choses in action which by application of the statute of limitations only exist for a limited period of time.

The right to bring suit on the note and mortgage was therefore the property interest to which the government's lien attached. "Once a federal lien attaches to taxpayers' property, the government may then foreclose upon the property." *Stonehill*, 83 F.3d 1156. Jack's choses in action were "personal property subject to attachment and foreclosure by the government." *Id.*

Under Arkansas law, Ark.Code Ann. § 18–49–101(a) (1987), suits to foreclose mortgages may be barred if they have not been brought within the period of limitation for a suit on the debt. *See Karnes v. Marrow*, 315 Ark. 37, 43, 864 S.W.2d 848 (1993). As discussed above, we believe Arkansas would apply Illinois law to the note. This would include application of Illinois limitation period. *Durham v. Arkansas Dept. of Human Services*, 322 Ark. 789, 792, 912 S.W.2d 412 (1995).

"Obligations payable in installments run separate statutes of limitation against each installment at the time it becomes due." *C–B Realty and Trading Co. v. Chicago and North Western Ry. Co.*, 289 Ill.App.3d 892, 225 Ill.Dec. 59, 682 N.E.2d 1136, 1140 (1997) (citations omitted). "The party entitled to payments may bring separate actions on each installment as it becomes due or wait until several installments are due and then sue for all such installments in one cause of action." *Brown v. Charlestowne Group, Ltd.*, 221 Ill.App.3d 44, 163 Ill.Dec. 677, 581 N.E.2d 831, 832 (1991).

Interest under the note was to be paid yearly. It is undisputed no payments of any kind were made on the note. Thus, Kris and Karen were in default on the note on August 16, 1990. Further, the entire debt under the promissory note was due on August 15, 1992. Thus under Illinois law, Jack had to file suit within ten years of August 15, 1992.

Because we are applying Illinois rather than Arkansas law to the note, Jack's argument that his "property interest" in the note and mortgage expired before the government filed this lawsuit fails. Additionally, we need not address defendants' arguments that the note is unenforceable under Arkansas law because the government is not in possession of the original of the promissory note and did not possess it when the loss occurred. Ark.Code Ann. §§ 4–3–301, 4–3–309.

### 2. Count Two—Action to have Jack's Release of the Mortgage on the Mallard Point Property Set Aside as Fraudulent

Defendants move for summary judgment on this claim on the following grounds: (1) no fraudulent transfer within the meaning of the Arkansas Fraudulent Transfer Act, Ark.Code Ann. §§ 4–59–201 (Repl.1996) *et seq.* occurred because Jack did not have the requisite intent to hinder, delay, or defraud; and (2) the statute of limitations bars this claim.

The release was executed in 1995 after the government's lien arose. Section 4–59–204 provides as follows:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;

(i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b) In determining actual intent under subdivision (a)(1) of this section, consideration may be given, among other factors, as to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a

lienor who transferred the assets to an insider of the debtor.

Ark.Code Ann. § 4–59–204.

Additionally, under Ark.Code Ann. § 4–59–205, a transfer is fraudulent to president creditors if:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

*Id.*

Defendants contend there is simply no proof other than the fact that the release was to insiders, Jack's children, to establish Jack acted with actual intent to hinder, delay, or defraud the United States. Defendants contend the claim fails because this is insufficient as a matter of law to establish actual intent.

■ As the United States aptly points out, defendants have ignored the following: (1) Jack continued to use the property; (2) the tax assessment was made prior to execution of the release; (3) after the release, Jack had no substantial assets; (4) Jack conceded he owed large sums of money at the time the release was signed; and (5) the release was signed around the same time Jack borrowed $15,000 from Kris. We believe there is a question of fact as to whether Jack acted with the requisite intent.

Defendants do not address the United States' other claim that the release was executed without Jack having received reasonably equivalent value for the transfer.

We therefore leave this issue for determination at trial.

Even if the United States could establish actual intent, defendants argue the fraudulent conveyance cause of action is barred by the three year statute of limitations contained in Ark.Code Ann. § 4–59–209. The Arkansas Fraudulent Transfer Act provides that a claim under § 4–59–204(a)(1) or § 4–59–205(a) is extinguished if not brought within three years after the transfer was made or the obligation incurred. Ark.Code Ann. § 4–59–209(a) & (b). As this suit was filed more than three years after the release of the mortgage, defendants contend count two is barred by the statute of limitations.

■ In opposition, the United States first argues that defendants have waived the statute of limitations defense. As this case is less than a week from trial, we agree that the United States would be unfairly prejudiced if defendants are allowed to raise this issue now.

■ However, even if we allow defendants to raise this defense to the fraudulent conveyance count, we find it unavailing for another reason. As the United States points out, it is not bound by state statutes of limitations in enforcing its rights.

In *United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940), the Supreme Court was asked to determine whether a Florida statute which provided that "[a]ny ... claim or demand [against an estate] not so filed within eight months from the time of the first publication of the notice to creditors shall be void" applied to a claim brought by the United States. *Summerlin,* 310 U.S. at 416, 60 S.Ct. 1019.

The United States had acquired a claim against an estate by assignment. The United States did not file its claim against the estate within eight months and the state court ruled the United States' claim was void because not filed within the time

prescribed. *Id.*, 310 U.S. at 415, 60 S.Ct. 1019.

The Supreme Court reversed. It held that the United States was "not bound by state statutes of limitation." *Id.*, 310 U.S. at 416, 60 S.Ct. 1019. This "same rule applies whether the United States brings its suit in its own courts or in a state court." *Id.* It stated: "When the United States becomes entitled to a claim, acting in its governmental capacity and asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement." *Id.* at 417, 60 S.Ct. 1019.

The Supreme Court held:

the state statute in this instance requiring claims to be filed within eight months cannot deprive the United States of its right to enforce its claim; that the United States still has its right of action against the administrator, even though the probate court is to be regarded as having no jurisdiction to receive a claim after the expiration of the specified period.

*Id.* at 418, 60 S.Ct. 1019.

It has been repeatedly held that the United States is not bound by the state's fraudulent conveyance statute of limitations simply because it looks to state fraudulent conveyance law in seeking to set aside a transfer. *See e.g., Karras v. Karras,* 16 F.3d 245, 246 (8th Cir.1994); *United States v. Wurdemann,* 663 F.2d. 50, 51 (8th Cir.1981). We believe *Summerlin* is clearly applicable. *See e.g., United States v. Bacon,* 82 F.3d 822 (9th Cir.1996) (State statute of limitations for actions under the Conveyance Act does not apply to the federal government). Accordingly, this claim is not time barred.

### *Conclusion*

For the reasons stated, the United States' partial motion for summary judgment will be denied. The partial motion for summary judgment filed by Jack Jepsen, Kris Jepsen, and Karen Jepsen Ma-

kutenas will be denied. A separate order in accordance herewith will be entered.