Roy and Norma Shirley INGRAM, Husband and Wife, and Kenneth and Kathy Ingram, Husband and Wife *v.* Sedric and Phyllis WIRT, Husband and Wife, and George and Trudy Henley, Husband and Wife

93-278                                              864 S.W.2d 237

Supreme Court of Arkansas
Opinion delivered November 1, 1993
[Supplemental Opinion on Denial of Rehearing
December 20, 1993.]

554

*Hardin & Grace, P.A.*, for appellants.

*Marian M. McMullan*, for appellees.

JACK HOLT, JR., Chief Justice. This is an appeal of the chancery court's finding that a restrictive covenant prevents the appellants, Roy, Norma, Kenneth and Kathy Ingram, from placing two homes on their property, Lot 3, Block 5, Kellogg Addition of Pulaski County, Arkansas. We affirm.

The portion of the Kellogg Subdivision at issue is owned and divided as follows: appellees, Sedric Wirt and his wife, Phyllis, live on Lot 4 and Mr. Wirt's son lives on Lot 5. Appellees, the Henleys, live on Lot 6, and the Wirts' daughter's home is located on Lot 7. Each of the lots in blocks 5 and 6 of this addition are approximately 100 feet wide and 1300 feet deep as evidenced by a plat which was placed in evidence as appellants' Exhibit 4, and reproduced as follows:

Included on the plat and Bill of Assurance for Lot 3 is a restrictive covenant that reads:

> Said lot shall be restricted to one family residence only and no business or amusement houses may be built or maintained at any time upon any part of said lot, and this clause shall be taken to include boarding houses, tenement houses, inns, hotels, eating houses, clubs and restaurants.

A similarly worded, though not duplicate, version of this covenant is included in the plats and Bills of Assurance for Lots 4, 7, 8, 9, 12 and 13 (although Lots 12 and 13 are listed as being in the Sylvan

Acres subdivision rather than in Kellogg). According to these documents, all of these lots were developed by Metropolitan Trust Company.

Mrs. Bessie Rea, Roy Ingram's mother, owned Lot 3 in Kellogg Addition. Her frame home was located on the north one-third of the lot. In October of 1973, she deeded the south two-thirds of Lot 3, Block 5 (3B) to her son and daughter-in-law, Roy and Norma.

In 1975 the neighbors, the Wirts and the Henleys, gave Mr. and Mrs. Ingram permission to move a house onto the south end of Lot 3 so that Roy Ingram could take care of his ailing mother. This approval was given despite the existence of the restrictive covenant forbidding more than one home per lot in the subdivision. As Sedric Wirt explained during his testimony at the trial, "We agreed to do this because we were trying to be good neighbors." The Ingrams moved a house on a transport trailer across the Wirt property onto the south end of Lot 3 in 1975 — the house was later remodeled with brick veneer, and a swimming pool was placed behind the house some time later.

In May 1983 the Ingrams purchased the north one-third of Lot 3 from Mrs. Bessie Rea. Mrs. Rea subsequently died, and on April 1, 1989 her frame home burned beyond use and was later torn down. Shortly after the home burned, Mr. Wirt approached Mr. Roy Ingram concerning buying the north one-third of Lot 3 where the house had been situated, but Mr. Ingram refused. In May 1989, the Roy Ingrams sold the north one-third of Lot 3 to their son and daughter-in-law, Kenneth and Kathy Ingram.

Mrs. Roy Ingram mentioned to Ms. Wirt that her son would be putting a manufactured home on the north end of the property in place of the house which had burned down. The Wirts objected to this arrangement as did the Henleys, and as a result, they filed a lawsuit in Pulaski County Chancery Court asking that an injunction be issued against the Ingrams to prevent them from violating the restrictive covenant by placing a second residence on Lot 3. Two days before the trial, the Ingrams filed a replat and new Bill of Assurance as to this lot, replatting it into Lots 3A and 3B and amending the Bill of Assurance to allow one residence per each subdivided lot.

Mr. Basil Shoptaw, a civil engineer and land surveyor with Thomas Engineering Company, testified for the Ingrams. He stated that he had been involved in the replatting of their property. In order to accomplish this task, he had to go to the City of Sherwood for permission — an approval hearing was held on this issue, and the replatting was approved. A new Bill of Assurance was issued allowing two single-family residences on the original Lot 3.

After hearing Mr. Shoptaw's testimony as well as that of the parties, the chancellor determined that there was a common scheme of development at the time that the Kellogg Addition was formed that mandated only one single family residence per lot. In her final order, the chancellor provides an explanation for her decision:

> 3. Neither the doctrines of laches or estoppel were successfully shown by Defendants. The evidence at trial showed the Plaintiffs had previously acquiesced to two residences on the Defendants' lot, one of which burned, however, this did not constitute laches which would bar the Plaintiffs from seeking removal of the mobile home presently on the lot. The Court finds that the Plaintiffs delay in resorting to court action was not unreasonable under the circumstances and the Defendants did not suffer a detrimental change in position necessary to sustain the defense of laches.
>
> 4. The evidence presented at trial supports a finding that there exists a general plan of development in Kellogg Addition that, at the time Kellogg Addition was formed, a common scheme existed for one single family residence per lot.
>
> 5. The Court finds there are two residences located on Defendants' lots.
>
> 6. The Court finds the Plaintiffs are entitled to enforcement of the restrictive covenants in the Bill of Assurance which restricts one single family residence per lot in Kellogg Addition.
>
> 7. The Defendants cannot defeat the restrictive covenants by simply obtaining a replat from the planning commission

subdividing their lot. *Constant* v. *Hodges*, 292 Ark. 439, 730 S.W.2d 892 (1987). The Court finds the facts in *Constant v. Hodges* are virtually identical to this case and, further, that *Constant* is controlling.

8. The Defendants are, therefore, hereby enjoined from further violations of restrictive covenants contained in the Bill of Assurance by Metropolitan Trust Company, Grantor, to the Public, filed for record. . . . .and ordered to remove the second home from their lot within 30 days of entry of this Final Order.

As a result of this order, the Ingrams filed a Motion for Reconsideration.

Thereafter, the Ingrams filed a motion, pursuant to Ark. R. Civ. Pro. 60 (b), to vacate judgment. In a hearing on this motion, they attempted to introduce aerial photographs of the Kellogg Subdivision, one of which was made in 1974. These photographs were obtained from the Highway Department. The court refused admission of this evidence but did allow the Ingrams to proffer it.

On appeal, we consider the evidence in a light most favorable to the appellee. *Constant* v. *Hodges*, 292 Ark. 439, 730 S.W.2d 892 (1987). This court tries chancery cases *de novo* on the record and does not reverse a finding of fact made by the chancellor unless it is clearly erroneous. *Merchants & Planters Bank & Trust Co.* v. *Massey*, 302 Ark. 421, 790 S.W.2d 889 (1990).

### Replat — Restrictive Covenant

The Ingrams first argue that the chancellor erred in holding that they could not replat their lot and that they were governed by the restrictive covenant. In finding for the plaintiffs/appellees, the chancellor relied on *Constant v. Hodges*, 292 Ark. 439, 730 S.W.2d 892 (1987). In *Constant* the appellants attempted to subdivide a 1.73 acre lot in Robinwood Subdivision in Little Rock. The Bill of Assurance provided that the land would be restricted to single-family residences since the bill's purpose was to carry out a "general plan to develop said lands as a high-class suburban residential property." *Constant*, 292 Ark. at 441, 730 S.W.2d at 893. The chancellor found that a general plan of development existed in Robinwood and that, accordingly, the restrictive covenant was enforceable. In making his decision, the

chancellor noted a few characteristics of the area:

> *The character and nature* of the Robinwood Subdivision
> referred to in the Bill of Assurance signed by Cecil Gibson
> and Vera Gibson has been and is *single-family residences
> consisting of very valuable, large homes on large lots. The
> nature of the neighborhood and this pattern of develop-
> ment have not changed since the lands described in the Bill
> of Assurance were developed beginning in 1949, and this
> pattern has continued through the present time.* Although
> there may have been some violations (as alleged by
> defendants) of some of the provisions of the Bill of
> Assurance or some of the restrictions contained in deeds
> subsequently conveying lands subject to the Bill of Assur-
> ance, *those violations have been minor* and they have not
> destroyed the purpose of the Bill of Assurance or deed
> restrictions and these violations have not adversely af-
> fected the adjoining property owners.

*Constant*, 292 Ark. at 443, 790 S.W.2d at 894 *(emphasis added)*.

The chancellor looked at the character and nature of the
neighborhood, the continuity of the pattern of development and
whether any major violation of the purpose of the Bill of
Assurance had occurred. This court agreed with the chancellor
and affirmed his decision. *Id.*

Applying this test to the facts before us brings the same
result. First of all, the permitted violation of the purpose of the
Bills of Assurance, although major, was temporary. While it is
true that the Wirts and Henleys gave the Ingrams permission to
move a second house onto Lot 3 in 1975, this permission was of
limited duration. Testimony at trial revealed that the Wirts and
Henleys gave their permission only in order for the Ingrams to
care for their ailing mother who was up in years and unable to
care for herself. Once Mrs. Rea passed away, Mrs. Ingram's
daughter and son moved into Mrs. Rea's home. Mrs. Henley
testified that her family's reason for not complaining at that point
was:

> Mrs. Ingram's daughter and her son moved into the house.
> We talked about talking to the Ingrams, but Mrs. Ingram's
> daughter had cancer, so we didn't say anything. We felt
> that she needed to be there close to her mother. She got

> sicker and she moved back in with her mother and dad in the back of the property. Then it was a rent house for a short time. And we had discussed very definitely that we were going to have to take action about the renters because we could not tolerate the noise. About that time the kids that rented the house moved and the house burned. So we still had hopes that, perhaps, Roy would keep it to have the space or that he would sell it to Mr. Wirt.
>
> . . . . .
>
> I think our expectations were that Mr. and Mrs. Ingram would. . .their children would move away and then it would be a couple there as there is at Mr. Wirt's house and mine. It hasn't worked like that. There are lots of people that live in one house with lots of traffic and now it's moved to the front, to Kellogg, and now it's going to be more traffic.

Clearly, the Wirts and Henleys gave their permission for placement of the second house on Lot 3 only in order to help their neighbors take care of an ailing family member. Once Mrs. Rea passed away and her home burned down, Lot 3 contained one family residence and was in compliance with its Bill of Assurance. Lot 3 was then in keeping with the common scheme of development in Kellogg Addition.

The Ingrams also argue that there were other violations proven at the trial. We disagree. For example, the Ingrams contend that Lots 12 and 13 of Block 5, which originally were governed by the same restrictive covenant as Lot 3, were transformed into a subdivision containing approximately thirty lots. These lots now have about twenty five to thirty homes on them. While these two lots are only four lots away from the Henley's property, the original Bill of Assurance for Lots 12 and 13 lists them as being in Sylvan Acres not Kellogg Addition. Thus, these lots are simply not part of the Kellogg Addition. The fact that Metropolitan Trust was a common developer of both subdivisions is of no moment.

After examining the Bills of Assurance provided in the exhibits and noting the same restrictive covenant in all of them, it is easy to see how the Chancellor arrived at the decision that there was a general scheme of development in this area. The

primary test for the existence of a general plan of development is whether substantially common restrictions apply to all lots of like character or similarly situated. *Jones* v. *Cook*, 271 Ark. 870, 611 S.W.2d 506 (1981).

For their next arguments on appeal, the Ingrams claim that the trial court erred in refusing to hold that either waiver or unclean hands defeat the restrictive covenant. These arguments have no merit.

### *Waiver*

The Ingrams contend that the Henleys and Wirts waived any right to enforcement of the restrictive covenant when they permitted the Ingrams to place the second home on Lot 3.

The Ingrams concede that waiver was not raised in the pleadings but argue that the facts giving rise to this claim were tried with the consent of both parties. In support of this argument, they refer to comments made by the chancellor at trial in which she allegedly "implicitly recognized" the issue of waiver:

> Also I'm inclined to rule that neither the doctrine of laches or estoppel prevents the plaintiffs from bringing this case. . . . Clearly they knew about and allowed the home the [sic] be placed on the rear of the lot and so long as that house was there and there was a house in the front I don't think they could ever have complained about either of those houses because they allowed that to happen. And I recognize that they did it because they felt like the family needed to look after Mrs. Rea and that once Mrs. Rea was dead that they still weren't too happy about the two houses there but that whether they were happy about it or not they hadn't gotten any conditions, they's agreed to it. But now when that, you know, frame house burned down in '89, I think there could be a question about whether or not by agreeing to a second house going on they were forever forbidden to complain about it. But before anything else was — now, I recognize some planning steps may be have been taken, but before anything else was done they talked to the Ingrams and said, you know, we don't want you to move another house on here. . . .But I think they did serve notice that their agreement to allow two houses on there had been to the houses, the structures, that were

there and that. . .anyway, I'm just not inclined, unless somebody shows me a case that's very explicitly like this, to say that by agreeing to allow the house that the Ingrams now live in to be moved onto the back part of the lot they forever agreed that two houses could be there.

Estoppel and waiver are not synonymous. *Black's Law Dictionary* 1417 (5th ed. 1979). However, the two terms are commonly used interchangeably, especially in insurance law. *Black's Law Dictionary*, 495 (5th ed. 1979); *See Continental Ins. Cos.* v. *Stanley*, 263 Ark. 638, 569 S.W.2d 653 (1978). Here, it seems, the chancellor, while referring to estoppel, was actually discussing the defense of waiver. Accordingly, we will address this issue on appeal. Nevertheless, we find that it has no merit.

In *Continental Ins. Cos.* v. *Stanley*, 263 Ark. 638, 569 S.W.2d 653 (1978), an insurance case in which estoppel and waiver are used interchangeably, we defined waiver as:

> [V]oluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits. It may occur when one, with full knowledge of material facts, does something which is inconsistent with the right or his intention to rely upon that right. The relinquishment of the right must be intentional.

Applying this definition to the facts at hand, it seems that the appellees did not voluntarily abandon the restrictive covenant when they permitted Mr. Ingram to place a second home on Lot 3 so he could care for his mother. Clearly, when the Henleys and Wirts gave their permission for the placement of a second home on the premises in violation of the Bill of Assurance, they did not intend to "forever be deprived of its benefits." *See Stanley*. Accordingly, we hold that they did not waive their right to the restrictive covenant.

### Unclean Hands

The Ingrams also argue that the trial court should have refused to enforce the restrictive covenant because of the doctrine of unclean hands — in other words, "equity will not intervene on behalf of a plaintiff whose conduct in connection with the same

manner has been unconscientious or unjust." *Merchants and Planters Bank & Trust Co. of Arkadelphia* v. *Massey*, 302 Ark. 421, 790 S.W.2d 889 (1990).

The basis of this argument is that there was some confusion as to whether there was more than one house located on Lot 6 which is owned by the Henleys. Chancellor Brantley adopted the testimony of the appellees, specifically Mrs. Henley, as to the existence of only one house on this lot. The Ingrams contended that there was a rent house on the Wirt's property which bordered on Lot 6 and the Henley home was located on Lot 6. There was contradictory evidence on this issue, and the Chancellor chose to believe Mrs. Henley when she said there was only one home located on this lot. We will not set aside a chancellor's finding of fact unless clearly erroneous. *Southeast Arkansas Landfill, Inc.* v. *State*, 313 Ark. 669, 858 S.W.2d 665 (1993). Deference is given to the superior position of the chancellor to judge the credibility of witnesses. *Riddick* v. *Streett*, 313 Ark. 706, 858 S.W.2d 62 (1993). In order to overturn the chancellor's ruling, the appellants must demonstrate that the trial court abused its discretion by making a judgment call that was arbitrary or groundless. *Employers Nat'l Ins. Co.* v. *Grantors*, 313 Ark. 645, 855 S.W.2d 936 (1993). The Ingrams have failed to provide proof of such abuse, and we, therefore, hold that their argument fails.

### Motion to Vacate Judgment

For their final issues on appeal, the Ingrams contend that the chancery court erred in refusing to admit the aerial photographs during the hearing on the motion to vacate judgment and in denying this motion. At the hearing on the motion to vacate judgment, some three months after the final order in this case was entered, the Ingrams attempted to admit aerial photographs obtained from the Arkansas Highway Department of the Kellogg neighborhood to establish "that a general plan of development had not been applied to all lots of like character to the lot of Defendants in the Kellogg Addition." The Ingram's motion to vacate was filed pursuant to Ark. R. Civ. Pro. 60(b) which provides:

> Ninety-Day Limitation. To correct any error or mistake or to prevent the miscarriage of justice, a decree or order of a

circuit, chancery or probate court may be modified or set aside on motion of the court or any party, with or without notice to any party, within ninety days of its having been filed with the clerk.

In interpreting the language in Ark. R. Civ. Pro. 60(b) we have said that the "miscarriage[s] of justice" referred to in the rule are a reference to those clerical errors or mistakes described in Rule 60(a). *Phillips* v. *Jacobs*, 305 Ark. 365, 807 S.W.2d 923 (1991). Rule 60(a) provides:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time on its own motion or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

Such a clerical mistake was not demonstrated to the chancellor. Accordingly, we hold that the chancellor was correct in refusing to admit the aerial photographs. Similar to this argument is the Ingram's claim that the denial of the Motion to Vacate was error.

In their Motion to Vacate Judgment, the Ingrams stated that the trial court made a mistake in determining that there was a general plan of development in the Kellogg Addition. Other than the aerial photographs — which were not admitted — the Ingrams had nothing more to offer the judge as a basis for vacating the judgment. Under the circumstances, the decision to deny the motion was proper.

Affirmed.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
DECEMBER 20, 1993

869 S.W.2d 685

*Hardin & Grace, P.A.*, for appellants.

*Marian M. McMullan*, for appellees.

JACK HOLT, JR., Chief Justice. In their petition for rehearing, the Ingrams challenge our holding in *Ingram* v. *Wirt*, 314 Ark. 553, 864 S.W.2d 237 (1993), by enumerating four points of error in the opinion. We deny the petition but address the errors alleged in order to clarify our analysis.

The Ingrams' first two assignments of error concern our holdings that there was only one violation of the restrictive covenant and that it was "temporary" in nature when, in fact, the chancellor did not discuss waiver, temporary or otherwise, when reaching her decision in favor of the Wirts and Henleys, and there

were in fact, other violations of covenants within the Kellogg Addition.

## RESTRICTIVE COVENANT

The Ingrams are correct in part for the chancellor in her findings focused on the circumstances of the acquiescence to the violation of the restrictive covenant stating:

> The finding at trial that neither the doctrine of laches nor estoppel prevents the Plaintiffs from seeking enforcement of the restrictive covenant contained in the Bill of Assurance as to the Defendants' property should not be disturbed. The Plaintiffs' prior acquiescence to two residences on the Defendants' lot, one of which burned, does not constitute laches barring the Plaintiffs from seeking removal of the mobile home presently on the lot.

For this reason, we were improvident in characterizing and labeling Ingram's violation of the restrictive covenant as "temporary." A more correct statement would have been that there was not a waiver of the restricted covenant in that the Wirts' and Henleys' prior acquiescence to the two residences on the Ingrams' lot, did not constitute laches barring the Wirts and Henleys from seeking removal of the mobile home placed on Lot 3.

Simply put, the facts of this case and our holding can be better stated as follows: The Wirts and Henleys gave the Ingrams permission to move the second house onto Lot 3 only in order for them to care for their ailing, elderly mother. Once Mrs. Rea passed away and her home burned down, Lot 3 contained one family residence and was in compliance with its Bill of Assurance. Taken together, these facts support our holding that the restrictive covenant remains in place. Thus, the Wirts and Henleys merely acquiesced to this violation of the Bill of Assurance on the part of the Ingrams. Once one of the homes burned and vanished from the premises, the restrictive covenant remained in place. As a result, the Ingrams were precluded by the covenant from placing and maintaining the mobile home as a second residence on their lot.

## OTHER VIOLATIONS

The Ingrams claim for the first time in their petition that the record inadvertently contained a Bill of Assurance for Lots 12 and 13 of Sylvan Acres, not Lots 12 and 13 of Kellogg Addition which would have supported their claim of other

violations of a Bill of Assurance and that we should now reconsider this substituted item of evidence. This we cannot do for we have to accept the record as it was originally presented to us, and based on this original record, we were correct in our holding that no other violations were proven at trial.

### UNCLEAN HANDS

The Ingrams also argue in regard to the equitable defense of unclean hands, we misstated the chancellor's finding as to the existence of one house per each of the Wirts' and Henleys' lots. In this regard, Judge Brantley stated:

> I would say there are only a few facts in dispute and I could probably find those, but I'm going to find that Mrs. Henley's house is totally located on Lot 6. I recognize that there is a dispute, but nobody got a survey and I have to believe the homeowner is in the far better position to know where her house is and, therefore, I. . .of course, I find her a credible witness.

> I'm just going to find as on the lots that the plaintiffs own *there is no more than one house per lot*, although the ownership of the lots has been. . .is divided. Not one person owns each of these lots.

Tracking the trial court's opinion, we noted in our opinion that:

> The basis of this argument is that there was some confusion as to whether there was more than one house located on Lot 6 which is owned by the Henleys. Chancellor Brantley adopted the testimony of the appellees, specifically Mrs. Henley, as to the existence of only one house on this lot. The Ingrams contended there was a rent house on the Wirt's property which bordered on Lot 6 and the Henley home was located on Lot 6. There was contradictory evidence on this issue, and the Chancellor chose to believe Mrs. Henley when she said there was only home located on the lot.

*Ingram v. Wirt*, 314 Ark. 553, 564, 864 S.W.2d 237 (1993).

Rather than summarily state in our opinion, as we did, that the evidence at trial was disputed as to whether or not there was more than one house on Lot 6 at any given time we could have embellished somewhat upon the factual basis of the trial court's findings and in particular by reciting Mrs. Henley's testimony:

> Our home does not stretch across Lots 5 or 7. Lot 6 is wider

than the other two lots and accommodates our home. There are no other homes located on original Lot 6. There are no homes other than Danny Wirt's on original Lot 5. There are no homes other than Cindy House's [Wirt's daughter] on original Lot 7. I am not aware of any other lots in Kellogg Addition that have two homes on them other than the Ingrams.

■ Ownership of Lot 6 was indeed divided, however, it is obvious that the chancellor determined that there was only one house per lot as there was testimony at trial indicating that from 1964 until 1989 there was a yellow rent house that bordered on Lots 6 and 7 that was ultimately torn down when Cindy Wirt built her house on Lot 7 and that since there was only one house now located on Lot 6, there was no violation of the restrictive covenants by the Wirts and the Henleys. We do not disagree with the chancellor's findings in this regard.

### A.R.C.P. RULES 60(a) and (b)

■ In the opinion, we stated, relying on *Phillips v. Jacobs*, 305 Ark. 365, 807 S.W.2d 923 (1991), that the "miscarriage[s] of justice" referred to in 60(b) refer to clerical mistakes or errors as described in Rule 60(a) and that, since a clerical mistake was not demonstrated to the chancellor with regard to the aerial photographs, the chancellor was correct in refusing to admit them. Now, the Ingrams claim that in so holding, we blurred the distinction between the two rules. We disagree, for as we explained in *Phillips, supra*:

> Rule 60(a) does grant authority in the trial court to act on its own motion to correct clerical errors and mistakes. Rule 60(b) then provides ninety days in which the trial court may, on its own motion or any party's motion, correct the error or "prevent the miscarriage of justice." The reference to certain miscarriages of justice in Rule 60(b) is a reference to those clerical errors or mistakes described in Rule 60(a).

*Phillips*, 305 Ark. at 367, 807 S.W.2d at 925.

### ORAL ARGUMENT ON PETITION FOR REHEARING

■ Lastly, the Ingrams submit that they should be permitted to argue their petition orally before the court. Oral argument on a petition for rehearing is not authorized under our rules. See Ark. Sup. Ct. R. 2-3(i). Thus, this request is denied as is the petition for rehearing.