IN THE MATTER OF F & M BUILDING PARTNERSHIP *v.*
FARMERS & MERCHANTS BANK, Rogers, Arkansas, et al.

93-710                                            871 S.W.2d 338

Supreme Court of Arkansas
Opinion delivered February 21, 1994
[Rehearing denied March 28, 1994.]

*Richard C. Downing, P.A.*, by: *Richard C. Downing* and

*Hardin & Grace*, by: *David A. Grace*, for appellant.

*Lyons & Emerson*, by: *Scott Emerson*, for appellees.

Tom Glaze, Justice. At issue in this case is the legal effect of two settlement agreements made in bankruptcy proceedings that involve real property upon which the main building of Farmers & Merchants Bank of Rogers, Arkansas (F & M Bank) stands. In 1984, F & M Bank entered into two leases with F & M Building Partnership, an Arkansas general partnership (F & M) and owner of the realty. F & M leased the land and improvements to F & M Bank through an Agreement of Lease and a Ground Lease.

In 1986, the partners of F & M were Mrs. Charlotte Lloyd and two trusts whose beneficiaries were her two sons. At that time, Mrs. Lloyd was married to Phillip Lynn Lloyd, who was the sole shareholder of Lynxx Limited, Inc. (Lynxx). F & M became involved with Lynxx in the two following transactions: (1) On April 8, 1986, Lynxx borrowed $2,100,000 from First Federal Savings and Loan Association of Paragould (First Federal), Lynxx signed a promissory note for the loan amount; the loan was secured by a mortgage of F & M's interest in its real estate, building, personal property and assignment of F & M's rents and revenues, including its interest in the F & M Bank leases. (2) In a separate document dated April 8, 1986, F & M agreed with Lynxx to secure Lynxx's note and loan from First Federal in return for Lynxx loaning F & M $1,705,000, which was evidenced by a note dated April 15, 1986. Lynxx's loan of $1,705,000 to F & M was unsecured and came from the $2.1 million proceeds Lynxx borrowed from First Federal.

On November 6, 1986, Lloyd filed for Chapter 11 bankruptcy, which was later converted to Chapter 7. A trustee was appointed, and during the course of the bankruptcy proceedings, the trustee entered into two separate settlement agreements which involved the above two transactions. In Settlement Agreement #1, dated December 5, 1988, F & M agreed to make its payments owed Lynxx on the $1,705,000 note to First Federal. Settlement Agreement #2 was executed on December 14, 1988, and it acknowledged that Lynxx agreed to First Federal's right to receive Lynxx's payments from F & M in return

for releasing Lynxx from any future liability. It further provided that First Federal agreed that the $2.1 million loan was "non-recourse" as to Lynxx and that it would not accelerate the $2.1 million loan so long as F & M continued timely payments on the $1,705,000 note.

Before the trustee's two settlement agreements were approved by the bankruptcy court, the Lloyds divorced, and in their property agreement, they agreed that Mrs. Lloyd would transfer her interest (and their sons') in F & M to Mr. Lloyd for $50,000. In turn, Mr. Lloyd accepted the assets and liabilities of F & M.[1] Thereafter, the bankruptcy court approved the trustee's two settlement agreements, and no one objected. Subsequently, the Resolution Trust Corporation, as receiver, took over First Federal and sold the $2,100,000 Lynxx note to Peoples Bank of Paragould (Peoples).

F & M later failed to make its quarterly payments on the $1,705,000 note. As a consequence, F & M Bank, as a tenant which was current on its lease obligation to F & M, initiated this interpleader and declaratory judgment action requesting the court to declare whether its monthly payments should be paid to F & M or Peoples, which was in present possession of the Lynxx note. Peoples answered and filed a third-party complaint against F & M for foreclosure under the mortgage. F & M answered Peoples, claiming Settlement Agreement #2 had discharged F & M as a surety for Lynxx and asserting that discharge effectively released F & M from its original obligation to First Federal (and now Peoples, which was assigned the $2.1 million note). Under an agreed temporary order of the trial court, F & M Bank continued to make its lease payments to Peoples.

Following a hearing, the chancellor ruled that F & M had not been released of its original loan obligation and the assignment and mortgage securing the loan was a valid first lien on F & M's bank building and ground lease. The trial court granted Peoples a foreclosure under the $2.1 million note and mortgage, and an in rem judgment of $1,956,173.35, plus accrued

---

[1] At some time after the divorce, Mr. Lloyd then transferred back to his two sons, individually, interests in F & M with Lloyd retaining 95% ownership in F & M.

interest of $72,935.38, attorney's fees and costs, and interest against F & M. F & M appeals from that order.[2]

On appeal, this court tries chancery cases *de novo* on the record while considering the evidence in a light most favorable to the appellee. Further, this court will not reverse a finding of fact made by the chancellor unless it is clearly erroneous. *Ingram* v. *Wirt*, 314 Ark. 553, 864 S.W.2d 237 (1993).

For reversal, F & M relies on its argument that it was a surety for Lynxx under the $2.1 million loan from First Federal. Because Lynxx was released under bankruptcy agreement #2 from all liability under the $2.1 million, F & M argues, as surety, it was also released.

The chancellor found no evidence reflecting F & M was a surety of the $2.1 million note between First Federal and Lynxx. Instead of containing language of a suretyship, the chancellor found the mortgage was an unconditional assignment to First Federal of F & M's interests in the two leases. Further, the chancellor also held F & M was not a surety at law because F & M was the recipient of $1.7 million of the $2.1 million loan to Lynxx.

This court has defined a suretyship as a contractual relation whereby one party engages to be answerable for the debt or default of another. *Fausett Builders, Inc.* v. *Globe Indemnity Co.*, 220 Ark. 301, 247 S.W.2d 469 (1952); *see also* James L. Elder, *Stearns Law of Suretyship* § 1.3, at 3 (5th ed. 1951) (real suretyship arises where property is pledged or mortgaged as security for a debt of another). Further, a suretyship requires involvement of three parties:

> (a) the one for whose account the contract is made, whose debt or default is the subject of the transaction, and who is called the principal; (b) the one to whom the debt or obligation runs, the obligee in suretyship, called the creditor; and (c) the one who agrees that the debt or obligation running from the principal to the creditor shall be performed, and who undertakes on his own part to perform it if the principal does not, called the surety.

---

[2]No sale of the property has occurred. Previous to entry of the final order, Peoples' third-party complaint against Lynxx was dismissed without prejudice.

*Id.* at 3. In a suretyship, the principal's contract and the bond or undertaking of the surety are to be construed together as one instrument. *Fausett Builders, Inc.*, 220 Ark. 301, 247 S.W.2d 469.

■ After a close inspection of the four documents Lynxx, F & M and First Federal used to transact the $2.1 million loan, we conclude that F & M benefited by receiving $1,705,000 of the loan proceeds and that F & M unconditionally conveyed its lease interests to First Federal to secure the entire $2.1 million note. In sum, F & M was effectively a co-principal on the $2.1 million loan along with Lynxx. Further, because it pledged nothing, Lynxx was an unsecured co-principal of the loan.

The four documents to which we refer are the following: (1) the $2.1 million promissory note from Lynxx to First Federal, (2) the mortgage, assignment and security agreement from F & M to First Federal as security for the $2.1 million note, (3) an agreement between F & M and Lynxx wherein F & M agreed to secure the $2.1 million note with its leases, in return for Lynxx's agreement to borrow the $2.1 million and to "simultaneously loan" F & M $1,705,000 from proceeds of the $2.1 million loan, and (4) the unsecured $1,705,000 promissory note from F & M to Lynxx.

As pointed out above, it is clear F & M received the majority of the benefits under the $2.1 million note which in effect made F & M a co-principal with Lynxx. If we accepted F & M's argument, F & M in actuality would be its own surety of the $2.1 million, of which it received most of the proceeds.

■ It is generally stated that the relationship of principal and surety only arises when the purported surety does not have a direct personal relationship in the debt and from which he does not receive a benefit. *See* 72 C.J.S. *Principal and Surety*, § 9; 74 Am.Jur.2d *Suretyship*, § 3; *Johnson* v. *Jouchert*, 124 Ind. 105, 24 N.E. 580, 581 (1890), (one who has received and who retains the consideration or benefit of a contract cannot, in equity, occupy the attitude of a surety); *Kennermer-Willis Grocery Co.* v. *Hacker*, 225 Ala. 415, 143 So. 821 (1932), (the relation of surety does not exist where the consideration moves directly to or from the person claiming the privilege of a surety).

Next, F & M argues that, by operation of law, bankruptcy settlement #2 released its mortgage and assignment obligations to First Federal (Peoples) because that settlement agreement led to Lynxx's discharge in bankruptcy. Of course, F & M's argument is premised on its argument above that it served as surety for Lynxx on the $2.1 million. Because we hold F & M was not a surety for Lynxx, F & M's argument here fails as well.

Additionally, F & M argues that it was party only to bankruptcy agreement #1, not to settlement agreement #2. Therefore, F & M argues it should not be held accountable for the modification of the mortgage and release of Lynxx agreed to in settlement #2.

Bankruptcy agreement #1 was signed by Charlotte Lloyd personally and as trustee for her children and as general partner of F & M, and the bankruptcy trustee, and in pertinent part, that agreement provides as follows:

(8) Lynxx hereby specifically agrees to release [F & M], Charlotte [Lloyd], Kevin and Clay [children] of personal liability to Lynxx on the $1,705,000.00 note dated April 15, 1986 (the "$1.7 Million Note"). In return, [F & M] agrees to continue to make timely installment payments directly to First Federal Savings and Loan Association of Paragould, Arkansas under the terms of the $1.7 Million Note until the remaining amount owed to Lynxx by [F & M] is satisfied. ... In the event that [First Federal] should attempt to accelerate its Note from Lynxx in the principal amount of $2,100,000.00 secured by certain assets of [F & M], notwithstanding the making of continual and timely installment payments by [F & M] to [First Federal], the Trustee agrees to defend any such actions on behalf of Lynxx and [F & M].

Paragraph (2)(d) of that same agreement states:

Lynxx shall give [F & M] a $399,900.00 credit on the remaining balance of the $1,705,000.00 Note dated April 15, 1986 . . . made payable by [F & M] to Lynxx.

Nine days after settlement agreement #1 was executed, bankruptcy agreement #2 was signed by the bankruptcy trustee, by

the bankruptcy trustee as CEO of Lynxx, and by the president of First Federal. The second agreement specifically referred to agreement #1 and its parties. In addition, the parties to agreement #2 provided that, if the bankruptcy court did not approve agreement #1, agreement #2 would be null and void.

When a written contract refers to another instrument and makes the terms of that instrument a part of the contract, the two are construed together as the agreement of the parties. *Isbell* v. *Ed Ball Construction Co., Inc.*, 310 Ark. 81, 833 S.W.2d 370 (1992). Here, bankruptcy agreement #2 modified the original $2.1 million note and loan as follows:

> (5) Upon the execution and delivery of the $40,000.00 Note and the mortgage securing same [Little Rock property], Lynxx, the Trustee and [First Federal] shall execute and deliver Mutual Releases of All Claims in the forms attached hereto as Exhibit "A". It is specifically agreed and understood that the $2.1 million Lynxx loan shall remain in place and in full force and effect and that the purpose of the $40,000.00 Note is to release Lynxx from all future personal liability on the $2.1 Million Lynxx loan. . . . [First Federal] further acknowledges that the $2.1 million Lynxx loan is "nonrecourse" as to [F & M] and agrees that for so long as [F & M] continues to timely make its installment payments on its $1,705,000.00 note to Lynxx direct to [First Federal] that [First Federal] will not seek to accelerate the $2.1 million Lynxx loan provided that [F & M] is not otherwise in default of its obligations set forth in [F & M] collateral documents held by [First Federal]. Lynxx hereby consents to [F & M] making the aforesaid installment payments direct to [First Federal] for the life of the $1,705,000.00 note.

Peoples, as First Federal's successor in interest, suggests the foregoing modification discharged Lynxx from liability, but reaffirmed F & M's obligation under the $2.1 million note and mortgage. We agree.

Peoples' position is supported by the testimony of Clayton Blackstock, F & M's attorney at the time of the bankruptcy proceedings. Blackstock testified that he was involved in

the formation of bankruptcy agreement #2, and he said that the attorney for the trustee, Stuart Hankins, wanted two separate agreements in order to use agreement #1 in negotiations with First Federal. Blackstock testified as follows:

> I don't recall any conversation with respect to the release of the $2.1 million note. The conversations with Mr. Hankins both before and after this settlement agreement number one was entered into, but before settlement agreement number two was entered into. Stuart Hankins had negotiated with First Federal, had called us about the mortgage and collateral, this pledge from F & M Building. Partnership to First Federal of Paragould. And it was by communication to him that it was my client's desire not to hurt, in any way, Dan Kell and First Federal Savings and Loan of Paragould. And then, in essence, if it meant that the building would be foreclosed on to satisfy whatever the indebtedness might be, that building was available and the collateral was there to satisfy that, and he wanted to know that before going into settlement negotiation with First Federal Savings and Loan of Paragould. I recall that if the $2.1 million debt remained in effect, the building was there and available as collateral for the debt. And then he had that to work with in any negotiating with First Federal of Paragould.

From this testimony, it is clear F & M had full knowledge that the $2.1 million note (with the building and ground lease as collateral) remained in full effect and we cannot say the chancellor was clearly erroneous in relying upon it. Further, F & M's obligation under the mortgage was not increased by the modification since its property had been pledged in the event of default under the $2.1 million note. In other words, the fact that the party responsible for payment under the note changed from Lynxx to F & M, did not increase F & M's liability under the mortgage.

▇ We acknowledge F & M's argument that Blackstock's testimony concerning the bankruptcy agreements was inadmissible parol evidence. We must disagree. Normally, parol evidence is inadmissible when there is a written agreement; however, the test for its admissibility is whether the evidence offered tends to alter, vary, or contradict the written agreement, or whether it

tends to prove a part of the agreement about which the writing is silent. In the former instance, the testimony is inadmissible; in the latter, it is allowed. *Rainey* v. *Travis*, 312 Ark. 460, 850 S.W.2d 839 (1993); *Loe* v. *McHargue*, 239 Ark. 793, 394 S.W.2d 475 (1965); *Gallion* v. *Toombs*, 268 Ark. 955, 597 S.W.2d 842 (Ark. App. 1980). When ambiguity exists and the meaning of a contract becomes a question of fact, parol evidence is admissible. *Isbell* v. *Ed Ball Construction Co., Inc.*, 310 Ark. 81, 833 S.W.2d 370 (1992).

■ Here, the chancellor was correct in finding the two agreements were silent on a number of points which were necessary to understanding the complete agreement of the parties. Specifically, the chancellor found both agreements #1 and #2 were ambiguous and silent as to what was to occur after F & M paid the $1,705,000 note in full. Thus, the chancellor here admitted the parol evidence to ascertain and give effect to the true intent of the parties. Because none of the parol evidence that was admitted actually varied, altered, or contradicted the written terms of the agreements, it was properly admitted.

We hold the chancellor's findings as discussed above are not clearly erroneous, and affirm.