Andrew PICKENS, Madelyn Pickens Ashman, &
Rebecca Jane Pickens Lambi v. Freddie BLACK,
Individually and as Trustee of R.A. Pickens Trust A & B,
as the Executor of the R.A. Pickens Estate; Carol Pickens;
Laurie Black; Lea Blackwell; Owen Blackwell, III;
Luke Pickens; Madelyn Lambi; Catherine Lambi; &
Daniel Pickens Lambi

94-137                                         885 S.W.2d 872

Supreme Court of Arkansas
Opinion delivered October 31, 1994

476

*The McMath Law Firm, P.A.*, by: *Sandy S. McMath*, for appellants.

*Ramsey, Bridgforth, Harrelson & Starling*, by: *William C. Bridgforth* and *David R. Bridgforth*, for appellees.

TOM GLAZE, Justice. This is the second appeal in this case. *See Pickens* v. *Black*, 316 Ark. 499, 872 S.W.2d 405 (1994). The facts necessary for a complete understanding of this appeal are specified below.

In 1991, R. A. Pickens died testate leaving the family homestead to his third wife, appellee Carol Pickens. Appellants, the children of R. A. and his first wife Madelyn who died in 1968, filed suit challenging their father's will. They sought a declaratory judgment declaring they, and not Carol Pickens, are the rightful owners of the homestead and its contents. Alternatively, appellants asked for specific performance of an oral contract between R. A. and and his wife Madelyn. And finally, they claimed the appellees are barred from inheriting from R. A. because of the appellees' criminal neglect of R. A. during the last thirty hours of his life. Besides R. A.'s widow Carol, the appellees include Freddie Black, Carol's son-in-law, and Laurie Black, Freddie's wife and Carol's daughter by a prior marriage.[1]

The appellees filed a motion for partial summary judgment on the appellants' allegations that Freddie, Laurie, and Carol "deprived [R. A.] or allowed him to be deprived of necessary

---

[1]Other appellees include two more of Carol's children by another marriage and also appellant Rebecca Lambi's children.

medical treatment and permitted his physical health and condition to be materially endangered." Following a hearing on the motion, the chancellor granted summary judgment as to Freddie Black and Laurie Black, holding there was no evidence to support the allegations that they were culpable in the death of R. A. The motion as to Carol Pickens was denied because questions of fact remained.

Following trial on the merits, the chancellor entered his findings of fact and conclusions of law, and an order dismissing the appellants' complaint. On appeal, the appellants challenge the chancellor's findings that they were not remaindermen of a life estate devised to their father R. A. Pickens under his father's will, that there was no enforceable contract between R. A. and Madelyn as to the disposition of the Pickens land, and that Carol Pickens was not culpable of neglecting appellants' father during the last hours of his life. Appellants also appeal from the order of partial summary judgment wherein the chancellor held that Freddie and Laurie Black were not culpable of neglecting R. A. during the final hours of his life.

On appeal, this court tries chancery cases *de novo* on the record while considering the evidence in a light most favorable to the appellee. *In the Matter of F & M Building Partnership v. Farmers & Merchants Bank*, 316 Ark. 60, 871 S.W.2d 338 (1994). Further, this court will not reverse a finding of fact made by the chancellor unless it is clearly erroneous. *Id.*

First, the major contention between the parties begins with the disposition of the family homestead and its contents by R. A.'s father, Burton Pickens, in his 1930 will. In the fourth paragraph of his will, Burton provided in pertinent part the following:

FOURTH: The following described real property lying in Desha County, Arkansas, to wit:

Lot Four (4) in and of Block One (1)
of the Town of Walnut Lake;

together with the residence thereon located, being my homestead, together with all household, kitchen and dining room furniture and equipment located therein and used in connection therewith, *I devise and bequeath unto my wife, Ollye*

*Pickens, for the term of her natural life, and at her death unto my son R. A. Pickens and unto the heirs of his body in fee simple forever*; provided, that if my said son R. A. Pickens should not be living and have no heirs of his body surviving him, at the time of the death of my wife Ollye Pickens, or if after the death of my said wife Ollye Pickens, my said son R. A. Pickens should die leaving no heirs of his body surviving him, then in either event, the remainder estate in said homestead and household goods shall become a part of the B. C. Pickens Trust hereafter created[.]

(Emphasis added). Another provision of Burton's will established the B. C. Pickens Trust.

In reviewing the paragraph four language, the chancellor held that Burton devised a life estate in the homestead to his widow Ollye with a remainder in R. A. in fee simple. Citing *Bowlin* v. *Vinsant*, 186 Ark. 740, 55 S.W.2d 927 (1933) with approval, the chancellor held that Burton intended that the family homestead and its contents was to vest in R. A. in fee simple upon the death of Ollye, if R. A. was alive at the time of Ollye's death. However, Ollye renounced Burton's will and elected her dower share, thus causing R. A.'s remainder interest to vest upon the renunciation.[2] *See Union Trust Co.* v. *Rossi*, 180 Ark. 552, 22 S.W.2d 370 (1929) (it is presumably the intention of the testator that a renunciation of the life estate shall be considered as equivalent to its termination by the death of the life tenant, and that the beneficiaries entitled in remainder shall enter into its enjoyment at once); *see also* Ark. Code Ann. § 28-11-405 (1987).

Appellants argue that "[t]he devise of the homestead, in providing for the succession to pass to the B. C. Pickens Trust in event of R. A. Pickens dying without bodily heirs, created a life estate in R. A. following the life estate of Ollye, with alternative contingent remainders in, first, the bodily heirs of R. A., and second, the B. C. Pickens trust." Appellants further aver that title actually remained in grandfather Burton or his heirs, subject to the two contingencies, instead of being placed in R. A., who was a minor at the time Burton's will was executed. Appellants rely

---

[2]The chancellor correctly noted that a fee tail cannot exist in personal property. *Festinger* v. *Kantor*, 272 Ark. 411, 616 S.W.2d 455 (1981).

upon the language in the will, "unto the heirs of his body", and Arkansas law on fee tail.[3] Appellants claim the drafters of Burton's will were knowledgeable in the law of estates and that one of the drafters wrote the Arkansas Probate Code.

In support of their argument, appellants cite *Fletcher* v. *Hurdle*, 259 Ark. 640, 536 S.W.2d 109 (1976) and *Cox* v. *Danehower*, 211 Ark. 696, 202 S.W.2d 200 (1947). In *Fletcher*, this court found the testator created alternative contingent remainders. In *Cox*, the court described contingent remainders in the alternative as arising when "more than one estate in remainder may be limited after a single particular estate if the limitation is in the alternative so that one may take effect if the other does not." *Cox* at 701 (citation omitted). These cases are distinguishable in the testamentary language used, and in fact, appellants ignore the language of both these cases wherein this court cited with approval the cases and holdings cited by appellees.

█ Chief among those cases cited by the appellees (and heavily relied on by the chancellor) is *Bowlin* v. *Vinsant*, 186 Ark. 740, 55 S.W.2d 927 (1933). There, the testator left the homestead to his wife "during her life, at her death, or should my said wife not survive me, unto my daughter, Gertrude Vinsant, and unto the heirs of her body." *Id.* at 741. In holding that Gertrude received the homestead in fee simple, the *Vinsant* court stated the following:

> This court has often ruled that where land is conveyed, or devised, to a person and the heirs of the body, children, or issue of such person, such conveyance or devise creates an estate in fee tail in the grantee or devisee, which, under our statute [now § 18-12-301] becomes an estate for life only in the grantee or devisee, and a fee simple absolute in the person to whom the estate tail would first pass, according to the course of the common law, by virtue of such devise, grant or conveyance.

---

[3]Ark. Code Ann. § 18-12-301 (1987) provides that a devise or grant in fee tail is abolished and the devisee or grantee shall be seized of a life estate with the remainder to "pass in fee simple absolute to the person to whom the estate tail would first pass according to the course of the common law by virtue of the devise, gift, grant, or conveyance." In other words, the statute substitutes the fee tail with a life estate in the grantee or devisee and a remainder in fee simple in his or her issue.

*Id.* at 741 citing *Pletner* v. *Southern Lumber Co.*, 173 Ark. 277, 292 S.W. 370 (1927). *See also Bell* v. *Gentry*, 141 Ark. 184, 218 S.W. 194 (1920) (the law favors the vesting of estates as early as possible).

Thus, in applying the rule of *Vinsant* and *Pletner* to Burton Pickens' will here, Ollye received a life estate, and upon her death, R. A. received the homestead in fee simple. Further, if R. A. failed to survive Ollye, his bodily heirs would take in fee simple; but if R. A. failed to survive Ollye and left no bodily heirs, then the homestead would devise to Burton's trust. In other words, since Burton devised a life estate to Ollye, he could not then devise another life estate to R. A., using the fee tail language.

■■ In the interpretation of wills, the paramount principle is that the testator's intent governs. *In Re: Estate of Harp*, 316 Ark. 761, 875 S.W.2d 490 (1994). The testator's intent is to be gathered from the four corners of the instrument itself. *Id.* Furthermore, the intention of the testator to dispose of his entire estate will be presumed, unless the language of the will shows the contrary. *Id.* And while this presumption is not controlling, it must always be considered when the language is so ambiguous as to require construction. *Id.* However, the testator's intent is limited by the rule of law. *Union Trust Co.*, 180 Ark. 552, 22 S.W.2d 370. Based on Arkansas case law, the general rule that the law desires property to vest as soon as possible, and the fact Burton could have easily left R. A. a life estate if he had so intended, the chancellor was correct in his application of the law and holding that the homestead was held by R. A. in fee simple.

Next, appellants claim that their father R. A. had contracted with their mother Madelyn that, if Madelyn omitted the couple's only son Andrew from her will, thereby disinheriting him of Madelyn's separate family property located in Wheatly, R. A. would leave Andrew the "Pickens property" in R. A.'s will. In support of their claim, appellants urge that the fact that Madelyn devised her Wheatly property only to her two daughters is evidence showing the oral contract existed between their parents. They cite testimony from nine witnesses and R. A.'s own letters which they allege confirm the presence of the agreement.

Appellees counter stating the chancellor was correct when he found there was no clear evidence that R. A. and Madelyn entered into an enforceable oral contract. Appellees point to the testimonies of R. A.'s attorney and accountant who said they were never told of any oral contract between R. A. and Madelyn. Further, evidence showed that in 1963, both Madelyn and R. A. made wills, wherein R. A. bequeathed to Madelyn 50% of his interest in R. A. Pickens & Son, and Madelyn bequeathed that same interest to all three of the appellants, including Andrew.[4] This evidence was offered to refute the appellants' assertion that Madelyn disinherited Andrew in reliance on an oral agreement. The evidence also showed the appellants were aware that R. A. changed his will numerous times over the years after Madelyn's death, and none of them challenged his authority to do so. Finally, there was no evidence that R. A. ever devised the Pickens property to Andrew in any of his wills.

■■ In *McDonald* v. *Petty*, 254 Ark. 705, 496 S.W.2d 365 (1973), this court stated that an oral contract to make a will to devise or to make a deed to convey real estate is valid when the testimony and evidence to establish such a contract is clear, cogent, satisfactory, and convincing. Further, the evidence must be so strong as to be substantially beyond reasonable doubt. *Id.* Here, the chancellor found that, based on the testimony and the credibility of the witnesses, such a contract between the parents was not intended and never existed. This court cannot say that the chancellor was clearly wrong.

Next, under Ark. Code Ann. § 5-28-103(a) (Repl. 1993)[5], the appellants alleged below that Carol Pickens was culpable in the death of R. A. by neglecting him, depriving him of medical treatment, and allowing him to overdose himself on morphine. Because of this culpability, the appellants argue that Carol is barred from benefitting under R. A.'s will.

■ The chancellor found that during the final three days,

---

[4]This 1963 will was Madelyn's last will. R. A. did not change his will again until 1972, after Madelyn's death. At her death, Madelyn did not own any interest in R. A. Pickens & Son.

[5]Section 5-28-103(a) provides criminal penalties for any person or caregiver who abuses, neglects, or exploits any adult who cannot protect himself or herself.

Carol took R. A. to his local doctor twice (once was in the hospital emergency room), called the doctor for consultation once, and called the doctor to the house twice. The evidence also showed R. A. refused to follow the recommendation of his doctor to see R. A.'s cardiologist in Little Rock. Additionally, R. A. was a strong-willed individual and did things his own way, including monitoring his own medicine. Finally, the chancellor found there was no evidence that Carol knew or should have known that R. A. had overdosed on morphine or the effect such an overdose would have on his heart. The chancellor accepted the opinion of R. A.'s cardiologist that getting well was not an option for R. A., but that keeping him comfortable was. Based on this evidence, the chancellor held Carol was free of any negligence or neglect. On appeal, the appellants have failed to show that the chancellor's findings of fact were clearly erroneous.

Finally, appellants challenge the chancellor's granting of partial summary judgment in holding that Laurie and Freddie Black also were not culpable in R. A.'s death. This issue is difficult to follow since most of the record containing appellees' motion and appellants' response with supporting documents is not abstracted. Also puzzling, we find in the record where Laurie and Freddie Black's deposition testimonies, bearing on their culpability in R. A.'s death, were actually entered at the trial of this case; and in its judgment, the trial court said, "[T]he plaintiffs (appellants) alleged Carol Pickens, Freddie Black and Laurie Black culpably neglected the deceased (R. A.) by denying him necessary medical care. *This is a fact question to be decided by the court.*" (Emphasis added.) The trial court then added that whether the Blacks' acts barred them from taking anything from R. A.'s estate was a question of law.

In sum, it would be guesswork on our part to decide any summary judgment issue based upon the record before us. Nonetheless, in reviewing the trial court's partial summary judgment order (which is abstracted), the trial testimony and the court's findings and final order (which are not abstracted), we cannot say the chancellor erred in deciding that no culpability existed on the Blacks' parts. In this respect the evidence showed that Freddie visited R. A. for two to three hours on the day before he died, and that R. A. was sitting up in a chair and able to get up and shake hands, but that on Freddie's return the next day,

Freddie found R. A. to be a very sick man. Freddie testified that R. A.'s local doctor was there at the time, and R. A. sat up in bed.

The chancellor further found that the presence of Laurie during the two days before R. A.'s death was for no other reason but out of concern for R. A. He found there was no evidence to show Laurie knew R. A. had overdosed or that she knew giving him a nitroglycerin pill under his tongue would have a detrimental effect on R. A. Accepting the foregoing evidence as true, the trial court could conclude the Blacks were free of culpability.

For the reasons given above, we affirm.